OPINION
{¶ 1} Defendant-appellant, David A. Bone ("appellant"), was indicted on one count of menacing by stalking, a fourth-degree felony, in violation of R.C. 2903.211(A)(1) based on conduct occurring on or about April 9 to July 8, 2004. Appellant waived his right to a jury trial. He was found guilty of menacing by stalking, and appeals from the judgment of the Franklin County Court of Common Pleas rendered on May 12, 2005. For the reasons that follow, we affirm.
 {¶ 2} The state presented three witnesses during its case-in-chief, including the victim, Annette Spicer ("Spicer"), Micah Qurshi ("Qurshi"), and Officer Michael Snider ("Officer Snider"), and established the following facts. In the autumn of 2003, Spicer was a full-time student at The Ohio State University and worked as a bartender at Jordan's Deli and Pub ("Jordan's") and at Stoly's bar ("Stoly's") in Franklin County. Jordan's is a small, neighborhood bar, and the people that frequent the bar tend to develop friendships with each other. Appellant was a regular customer at Jordan's before Spicer began working there as a bartender, and was known to the employees as "Rascal." Qurshi was employed at Jordan's as a barback, in which he assisted stocking the bar and cleaning up at night, as well as providing security as necessary.
 {¶ 3} In late 2003, Spicer began having problems with appellant. Appellant would sit at Jordan's at a location where Spicer could always see him, and would pound and slap on the bar to get her attention. Appellant would follow Spicer around the bar, and sing karaoke directed towards her. Additionally, appellant would write letters on napkins and paper and give them to Spicer. At trial, Spicer described these letters "[s]omewhat as — like poems. Not jokes by all means. I guess you would say in a weird way romantic." (Tr. 10.) When given these notes by appellant, Spicer would "just kind of brush him off." (Id.)
 {¶ 4} Karaoke was held every Wednesday at Jordan's. The bar hired a disc jockey to bring in equipment and karaoke recordings. All customers were invited to participate in karaoke, and the disc jockey provided a wireless microphone to the singers. According to Spicer, appellant was the only customer who would walk up to the bar with the wireless microphone and sing to her. In December 2003, appellant gave Spicer a compact disc that he recorded for her. Spicer did not listen to the compact disc and set it aside in a drawer at the bar.
 {¶ 5} Spicer described appellant's conduct as "[m]ore or less unwanted. It was more of an inactive contact. He wasn't very passive. It was more than just ordering a drink or, you know, small chitchat. He was bothering me, would tell me stories, ask me questions, give me gifts." (Tr. 12.) Spicer further described appellant's behavior, stating, "It was freaky. It was unwanted. Like I said, it was not passive. If I ignored him he didn't get the clue." (Tr. 87.) Spicer requested that appellant not contact her anymore, but he refused to comply with her request and continued to patronize Jordan's.
 {¶ 6} On February 14, 2004, appellant gave Spicer a gold bracelet and a chocolate rose as Valentine's Day gifts. Spicer discarded the chocolate rose, but wore the bracelet at appellant's request. As soon as appellant left the bar, Spicer removed the bracelet. Appellant returned to the bar later that same evening, and, apparently referencing the bracelet, asked Spicer "where is my shit?" (Tr. 13.) According to Spicer, she was shocked by appellant's comment and did not know how to react. She responded by telling appellant that she took the bracelet off, and that he did not need to speak to her that way.
 {¶ 7} After the incident on Valentine's Day, Spicer again told appellant to leave her alone. Spicer testified that "[i]t was just, things were seeming, or getting fairly weird, getting gifts from a customer, and, you know, him constantly following me around the bar and being there as long as I worked." (Tr. 15.) Spicer told appellant to "leave me the fuck alone." (Id.) Appellant continued to patronize Jordan's on the days Spicer worked, and started patronizing Stoly's on days when Spicer worked there.
 {¶ 8} Beginning in May 2004, appellant began staying at Jordan's through Spicer's entire 12-hour shift. Appellant began to order food and tip her more than previously. Although Spicer would get him a drink if he needed one, she would otherwise ignore him.
 {¶ 9} In June 2004, appellant asked Spicer if she would attend a Van Halen concert with him. Spicer told appellant that she "absolutely would not go," and that she had to work during the concert. (Tr. 21.) Appellant refused to accept Spicer's answer, and continued to ask her about the concert for over a month. Qurshi testified that he recalled a conversation appellant had with Spicer regarding a Van Halen concert, in which he heard Spicer tell appellant that she had already told him that she did not want to go to the concert. Qurshi stated that appellant appeared upset when Spicer told him this and had a scowl on his face after Spicer declined his invitation.
 {¶ 10} In late June 2004, Spicer received a dozen roses at Jordan's with an unsigned card. At that time, Spicer was not dating anyone and the date on which she received the roses was not a special occasion to her. The card stated that the writer hoped that Spicer would get a thrill from the roses and hoped that the roses proved the writer's love to her. Spicer was embarrassed by the flowers, and placed them in a sink under the bar. She saw appellant at Jordan's on the day she received the roses, but at the time, appellant did not make any comment regarding the roses. According to Spicer, appellant later asked her if she had "received the twelve little gifts." (Tr. 24.) Spicer responded by telling appellant that it was "weird" for him to send flowers without signing the card, that it "freaked" her out, and that she did not appreciate the flowers. (Tr. 24.) Spicer again told appellant to not have any contact with her.
 {¶ 11} On July 5, 2004, Spicer worked at Jordan's until the end of her shift at 3:30 a.m. As she was returning home, Spicer noticed a four-door silver Saturn automobile following her. She knew that appellant drove the same kind of automobile, but was unable to identify the driver of the automobile. According to Spicer, the vehicle kept the same distance behind her no matter what speed she was driving. The vehicle moved up behind Spicer's vehicle and then moved over to the lane next to her. It then sped past Spicer and swerved into the lane in front of her. The vehicle continued to drive in front of Spicer as she approached her apartment complex. When the vehicle reached Spicer's apartment complex, it began to turn into the entrance, but Spicer turned on another road in order to enter her complex through a back entrance. The vehicle U-turned and went through a red light in order to follow her. Before reaching her apartment, Spicer telephoned her roommate to tell her that she was being followed. Spicer's roommate held the apartment door open for her, and Spicer ran into her apartment as soon as she parked her car.
 {¶ 12} On July 8, 2004, after the bar closed at 3:00 a.m., Qurshi, at the request of Spicer and Jordan Petroviski, the owner of Jordan's, followed Spicer home in a separate vehicle. According to Qurshi, after walking Spicer to her apartment, he walked back towards the parking lot of the apartment complex. As he reached the parking lot, he observed a silver Saturn, the type of vehicle known by him to be driven by appellant, turn its headlights on and begin driving towards him rapidly. Qurshi testified that he recognized the driver of the vehicle as appellant. He called Spicer with his mobile telephone and told her that he had observed appellant in her parking lot, and that she should call the police. Qurshi returned to Spicer's apartment and waited until the police arrived.
 {¶ 13} Officer Snider testified that he was on duty in the early morning of July 8, 2004, patrolling the northeast area of Columbus with his partner, Officer Cromwell. Officer Snider received a call at around 3:30 a.m. to respond to the vicinity of Spicer's apartment and to look for a small silver Saturn automobile. There was very little traffic on the roads at that time of the morning, but before reaching Stone Valley Lane, where Spicer's apartment complex was located, Officer Snider and his partner "observed the vehicle that matched the description on the run." (Tr. 125.)
 {¶ 14} Officer Snider initiated a traffic stop of the silver Saturn in the parking lot of a Kroger grocery store that was located within one mile of Spicer's apartment, and determined that appellant was driving the vehicle. Officer Snider asked appellant why he was out at that time of night. Appellant told the officers that he was coming from his uncle's house. Appellant explained to the officers that his uncle lived in the northeast part of Franklin County. Officer Snider eventually permitted appellant to proceed on his way.
 {¶ 15} Qurshi described his observation of appellant's behavior towards Spicer on several occasions, including leaning over the bar at times to attract her attention as well as specifically attempting to try to speak with her. According to Qurshi, Spicer would step back from appellant in an effort to avoid him and try to continue to work. Qurshi testified that Jordan Petroviski first notified him on July 7, 2004, regarding the problems with appellant and told him that appellant was no longer permitted at Jordan's. Qurshi also stated that he had seen appellant's interactions with Spicer before July 6, 2004, but appellant's conduct was not violent and did not appear to put Spicer in physical danger. Qurshi explained that Spicer told him about appellant's unwanted gifts and conduct prior to appellant being banned from the bar.
 {¶ 16} Spicer testified that as a result of appellant's conduct, she was unable to sleep at night, kept all her lights on at night and her blinds closed, was afraid to go home by herself, and stopped going to class, which resulted in her losing her financial aid and not completing necessary coursework. Spicer stated that before appellant's unwanted behavior she was not having problems with sleeping or with school. Spicer testified that she did not seek help from her employers with regard to appellant until after the July 5, 2004 incident, which resulted in appellant being banned from Jordan's.
 {¶ 17} Appellant did not testify on his own behalf, nor did he call any witness in his defense. The parties stipulated that appellant had previously been convicted of an unrelated misdemeanor charge of menacing by stalking.
 {¶ 18} On appeal, appellant sets forth two assignments of error for our review:
First Assignment of Error: Appellant's conviction for menacing by stalking was not supported by the evidence and was against the manifest weight of the evidence.
Second Assignment of Error: The court erroneously sustained an objection when defense counsel sought to inquire into the prosecuting witness's prosecution for driving under the influence as a (sic) alternative basis for her claimed mental distress.
 {¶ 19} In appellant's first assignment of error he challenges both the sufficiency and weight of the evidence. We begin by addressing the sufficiency of the evidence. Appellant asserts that the evidence was insufficient to prove that his actions amounted to a "pattern of conduct" occurring within the time frame of April 9 to July 8, 2004, as specified in the indictment. Appellant contends that the trial court impermissibly considered incidents that occurred prior to April 9, 2004; to wit: the 2004 Valentine's Day incident. In response, appellee asserts that seemingly innocuous acts provide the context for the behavior that constitutes menacing by stalking, and that the court was not limited to consideration of behavior that occurred within the period specified in the indictment. According to appellee, the trial court was permitted to consider events that occurred prior to April 9, 2004, because those acts give context to appellant's actions that did occur during the period specified in the indictment.
 {¶ 20} Appellant further argues that the evidence was insufficient to prove that he acted knowingly, and it was also insufficient to prove that Spicer experienced mental distress, since there was no evidence of substantial incapacity or mental health treatment. Alternatively, he argues that there was insufficient evidence that appellant's actions were the primary cause of any mental distress that Spicer did experience. Appellee argues that it was not required to introduce expert testimony regarding mental distress and was not required to demonstrate that Spicer sought or received mental heath treatment.
 {¶ 21} The role of an appellate court presented with a sufficiency of evidence argument has been established by the Supreme Court of Ohio in State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 22} However, whether the evidence is legally sufficient is a question of law, not fact. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. An appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts" in determining whether the evidence is, in fact, sufficient.Jackson, supra, at 319. The weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80, 24 O.O.3d 150, 434 N.E.2d 1356. Thus, a conviction will not be disturbed on the sufficiency of the evidence unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Treesh
(2001), 90 Ohio St.3d 460, 484, 739 N.E.2d 749.
 {¶ 23} To prove menacing by stalking, in violation of R.C.2903.211(A)(1), the prosecution is required to prove beyond a reasonable doubt that appellant (1) by engaging in a pattern of conduct, (2) knowingly, (3) caused another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person. State v. Dario (1995),106 Ohio App.3d 232, 238, 665 N.E.2d 759. Proof that the accused actually caused physical harm or mental distress to the victim, or made direct threats to the victim's safety, is not required under the statute. State v. Horsley, 10th Dist. No. 05AP-350, 2006-Ohio-1208, at ¶ 45.
 {¶ 24} The element of "pattern of conduct," as defined by the statute means "two or more actions or incidents closely related in time." R.C. 2903.211(D)(1); see, also, Dario, supra, at 238. R.C. 2903.211 does not attempt to define or give further meaning to the phrase "closely related in time." Consequently, "whether the incidents in question were `closely related in time' should be resolved by the trier of fact `considering the evidence in the context of all the circumstances in the case.'" Dario, supra, at 238.
 {¶ 25} While the "pattern of conduct" is an element of and a precondition for the offense of menacing by stalking, it is not a part of the offense itself. State v. Shue, 8th Dist. No. 84007, 2004-Ohio-5021, at ¶ 16. "Rather, the pattern of conduct establishes how present behavior which is apparently innocent can be deemed threatening based on prior encounters between the parties." Id., citing State v. Tichon (1995),102 Ohio App.3d 758, 768, 658 N.E.2d 16; see, also, State v. Bilder (1994),99 Ohio App.3d 653, 658, 651 N.E.2d 502.
 {¶ 26} Appellant argues that the evidence failed to establish a pattern of conduct occurring between April 9, 2004 and July 8, 2004, the time period specified in the indictment. We disagree.
 {¶ 27} Spicer testified that a vehicle identical to appellant's followed her home in the early morning hours of July 5, 2004. Qurshi testified that he observed appellant in Spicer's parking lot in the early morning of July 8, 2004. Officer Snider also testified that he encountered appellant in his vehicle less than a mile from Spicer's apartment on July 8, 2004. Thus, there is circumstantial and direct evidence in the record that two "actions or incidents" occurred — appellant visiting the vicinity of Spicer's apartment two times during early morning hours. Circumstantial and direct evidence inherently possess the same probative value. Jenks, supra, at 272. Additionally, these incidents were "closely related in time" during the period contemplated in the indictment. Therefore, a rational trier of fact could have found beyond a reasonable doubt that appellant did engage in a pattern of conduct during the time period specified in the indictment.
 {¶ 28} Next, appellant argues that the trial court improperly relied on evidence introduced at trial concerning events that occurred before April 9, 2004. Appellant characterizes the court's comments from the bench as suggestive that the court based its finding that a pattern of conduct existed upon two incidents — the 2004 Valentine's Day incident and the July 8, 2004 incident, in which appellant was seen near Spicer's apartment. He argues that it was error for the trial court to have considered the 2004 Valentine's Day incident because it occurred before the time frame specified in the indictment. He further argues that without consideration of that incident, the trial court based its finding upon only one incident, which is insufficient evidence of a pattern of conduct.
 {¶ 29} In rendering its verdict, the trial court stated:
THE COURT: * * *. I'll be honest with you, Mr. Bone, when she told you no, you need to grow up at that point in time, you know, there was — especially with the flower incident, you know. I do find there was a course of, pattern of conduct.
Mr. Bone, I don't know, one night, the vehicle's there. I think I can make that presumption from here. I basically regret the fact that this incident had to come down to this. You know, dating technique, you know, your own personal pattern. When she said no, you should have taken no for an answer. With the flowers it made it abundantly clear to you not to do it, but you decided to drive out to her residence. And I find beyond a reasonable doubt that you are guilty of Menacing by Stalking. I do find the prior offense is there.
* * *
THE COURT: You know, because I don't think he should be institutionalized over this matter, but, you know, it's — I find beyond a reasonable doubt that those two incidents, he should have backed off. Going out to where she lived and following her in the area of where she goes exceeds, I don't know, the normal dating technique. I find a pattern of conduct. So I am going to find him guilty of Menacing by Stalking with his prior felony (sic) makes it a felony of the fourth degree. * * *.
(Tr. 150-151.)
 {¶ 30} Evid.R. 404(B) permits the admission of "other crimes, wrongs, or acts" for certain limited purposes, such as demonstrating "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." "Other acts" evidence is therefore admissible to prove a "scheme, plan or system in doing an act." Horsley, supra, at ¶ 24, quotingState v. Curry (1975), 43 Ohio St.2d 66, 72-73, 72 O.O.2d 37,330 N.E.2d 720. Other acts evidence may generally be introduced when the evidence forms "part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment." Curry, at 73. "Background evidence is evidence of events that are inextricably related to the alleged criminal act. * * * Evidence of other crimes may be presented when they are so blended or connected with the one on trial that proof of one incidentally involves the other, explains the circumstances thereof or tends logically to prove any element of the crime charged." (Citation omitted.) Horsley, at ¶ 24.
 {¶ 31} As we recently stated regarding other acts evidence in the context of a charge for menacing by stalking:
Evidence of prior acts and behavior is particularly important to prove the crime of menacing by stalking. Stalking may require examination of the offender[']s past conduct involving the victim to assist a jury in understanding the context of what otherwise might appear to be an innocent act. "Other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress."
Horsley, supra, at ¶ 26. (Citations omitted.)
 {¶ 32} Applying the foregoing authority to the present case, we hold that the trial court permissibly referred to and relied upon incidents occurring before April 7, 2004, because these incidents provided the context within which to determine whether appellant's conduct towards Spicer constituted knowing attempts to cause her to believe that he would cause her mental distress or physical harm. The trial court referred to the Valentine's Day incident because it proved that Spicer had sent a clear message to appellant that she was not interested in dating or having further contact with him. This provided helpful and relevant context within which to view the July 5, 2004 incident when appellant followed Spicer home, and the July 8, 2004 incident when appellant was seen in the vicinity of Spicer's residence precisely when she returned home from work. Accordingly, we find the trial court did not err in admitting and considering evidence of appellant's other acts committed prior to the period specified in the indictment.
 {¶ 33} Appellant next argues that the evidence was insufficient to prove the element of the requisite mental state. The mental state required for menacing by stalking is that of "knowingly." R.C. 2903.211(A)(1). Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Sufficient evidence supports the "knowingly" element of menacing by stalking if the evidence allows the trier of fact to reasonably conclude that the defendant was aware that his conduct would probably cause the victim to believe that the defendant will cause physical harm or mental distress to the victim.Dario, supra, at 238; see, also, State v. Hawk, 3rd Dist. No. 1-03-54, 2004-Ohio-1052, at ¶ 26 (knowingly within the context of aggravated menacing); State v. Goodwin, 10th
Dist. No. 05AP-267, 2006-Ohio-66, at ¶ 24 (knowingly within the context of aggravated menacing).
 {¶ 34} The evidence established that appellant was on notice that his attention towards Spicer was unwanted because she told him on a number of occasions to stop contacting her and to leave her alone. In February 2004, Spicer told appellant to "leave me the fuck alone," and in June 2004, she told him that his gift of roses with an unsigned card was "weird" and "freaked" her out, and that she did not want that kind of contact with him. Spicer's statements to appellant made it abundantly clear that his conduct towards her was unwanted. Thus, his continued advances towards her were sufficient to allow a trier of fact to determine that appellant acted knowingly.
 {¶ 35} Next, appellant argues that there was no evidence that Spicer experienced substantial incapacity or that she received mental health treatment and, therefore, the evidence of mental distress was insufficient.
 {¶ 36} The element of "mental distress" is defined in the menacing by stalking statute as:
(a) Any mental illness or condition that involves some temporary substantial incapacity;
(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.
R.C. 2903.211(D)(2).
 {¶ 37} Significantly, however, the statute also provides that, "[t]he state does not need to prove in a prosecution under this section that a person requested or received psychiatric treatment, psychological treatment, or other mental health services in order to show that the person was caused mental distress as described in (D)(2)(b) of this section." R.C.2903.211(E).
 {¶ 38} We recently discussed mental distress in the context of a prosecution for menacing by stalking, stating:
The statute requires only a pattern of conduct which causes the victim to believe that the offender will cause physical harm to the victim or will cause mental distress to the victim. Neitheractual physical harm nor actual mental distress isrequired. * * *
"The [trier of fact itself], can refer to [its] own experiences in order to determine whether, and to what extent, the defendant's conduct caused the serious emotional distress."Bilder, at 665. Accord State v. Scott, Summit App. No. 20834, 2002-Ohio-3199.
Horsley, supra, at ¶ 46, 47. (Emphasis added.)
 {¶ 39} Applying the foregoing authority from Horsley to the instant case, we hold that appellee was not required to prove that Spicer actually suffered mental distress of physical harm as a result of appellant's pattern of conduct, though from the evidence adduced, the trier of fact could have concluded that appellant's actions did cause Spicer mental distress. Appellee did need to prove that appellant, by engaging in a pattern of conduct, knowingly caused Spicer to believe that he would cause her mental distress or physical harm.
 {¶ 40} Spicer testified that, following the events of February through July 2004, she was unable to sleep at night, and that when she did sleep, she slept with her lights on and her blinds closed; and she was afraid to go home if she was alone. This was sufficient evidence upon which the trial court, as the trier of fact, could determine that appellant's pattern of conduct caused Spicer to believe that he would cause her mental distress or physical harm.
 {¶ 41} When viewed in a light most favorable to the prosecution, the evidence adduced at trial provides a sufficient basis upon which the trier of fact could conclude that appellant was guilty, beyond a reasonable doubt, of menacing by stalking in violation of R.C. 2903.211(A)(1). Thus, appellant's conviction was supported by sufficient evidence.
 {¶ 42} Appellant's final argument in support of his first assignment of error is that his conviction for menacing by stalking was against the manifest weight of the evidence. We note that even though a conviction may be supported by sufficient evidence, it may still be reversed as being against the manifest weight of the evidence. Thompkins, supra, at 387. Determinations of the weight to be given to evidence and the credibility of witnesses remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. In reviewing a manifest weight challenge, the court of appeals sits as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. See, also, Columbus v. Henry (1995),105 Ohio App.3d 545, 547-548, 664 N.E.2d 622. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "exceptional case in which the evidence weighs heavily against the conviction." State v.Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 43} In support of his argument that his conviction is against the manifest weight of the evidence, appellant contends that his behavior was harmless and did not appear to others to be menacing. Specifically, he points out that he had been a regular at Jordan's before Spicer began working there, and adds that the bar's owners never prohibited him from being at the bar until after July 6, 2004. He also points out that Qurshi corroborated that appellant's behavior was harmless because he testified that he never saw appellant become violent with Spicer and never felt that appellant placed Spicer in physical danger at the bar.
 {¶ 44} After reviewing the entire record and weighing the evidence presented by appellee and all reasonable inferences, and considering the credibility of the witnesses, we find nothing to indicate that the trial court clearly lost its way or that any miscarriage of justice resulted as to require a new trial. The weight to be accorded the evidence and determinations as to the credibility of witnesses were within the province of the trial court as the trier of fact. DeHass, supra, at paragraph one of the syllabus. The trial court was in the best position to assess the testimony and credibility of the witnesses to determine whether appellant's behavior was indeed harmless or whether it caused Spicer to believe that appellant would cause her mental distress or physical harm. Appellant's conviction for menacing by stalking was not against the manifest weight of the evidence.
 {¶ 45} For all of the foregoing reasons, appellant's first assignment of error is overruled.
 {¶ 46} In appellant's second assignment of error, he contends that the trial court erroneously precluded him from questioning Spicer about a charge for driving under the influence ("OVI"), and about how that prosecution may have affected her. At trial, appellant attempted to cross-examine Spicer regarding a prosecution against her for OVI. Appellee objected to this line of inquiry, and the trial court sustained the objection. Appellant did not attempt to rephrase his question, explain to the trial court why the line of questioning was relevant (such as, for instance, that the OVI prosecution occurred in the same time period during which appellant allegedly stalked Spicer), or proffer the excluded testimony.
 {¶ 47} On appeal, appellant argues that the OVI prosecution against Spicer is relevant because it provides an alternative explanation for any mental distress that Spicer experienced. He argues that an OVI prosecution could reasonably have caused Spicer to miss class and have difficulty sleeping, and it was the prosecution, not appellant's unwanted conduct, that affected Spicer in this manner.
 {¶ 48} Cross-examination is permitted on all relevant matters and on matters affecting credibility. Evid.R. 611(B). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Irrelevant evidence is not admissible. Evid.R. 402.
 {¶ 49} A trial court has the discretion to limit the scope of cross-examination taking into account the particular facts of a case. State v. Treesh (2001), 90 Ohio St.3d 460, 480-481,739 N.E.2d 749; State v. Hodge, 10th Dist. No. 04AP-294,2004-Ohio-6980 at ¶ 10. A trial court, therefore, has wide latitude to impose reasonable limits on cross-examination based upon concerns of harassment, prejudice, confusion of the issues, witness's safety, or interrogation that is repetitive or only marginally relevant. Treesh, at 480-481, citing Delaware v.Van Arsdall (1986), 475 U.S. 673, 679, 106 S.Ct. 1431,89 L.Ed.2d 674. "As such, an appellate court should be slow to disturb a trial court's determination on the scope of cross-examination unless the trial court has abused its discretion and the party illustrates a material prejudice."Hodge, at ¶ 10, citing Reinoehl v. Trinity Universal Ins. Co.
(1998), 130 Ohio App.3d 186, 194, 719 N.E.2d 1000. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.
 {¶ 50} As discussed earlier, in order to obtain a conviction for menacing by stalking, the prosecution must prove beyond a reasonable doubt that a defendant knowingly caused the victim to believe that the defendant will cause her mental distress or will cause her physical harm. The prosecution does not have to prove that a defendant caused the victim actual mental distress or physical harm. Horsley, supra, at ¶ 45, 47. Consequently, the relevant issue in the instant case was whether appellant was aware that his conduct would probably cause Spicer to believe that he would cause her mental distress or physical harm. R.C.2903.211(A)(1); Dario, supra, at 238. Other possible stressors in Spicer's life are irrelevant to this inquiry. As such, evidence of Spicer's OVI was properly excluded. The record demonstrates that appellant was given the opportunity to cross-examine Spicer regarding whether she believed that appellant would cause her mental distress or physical harm, which was the relevant inquiry.
 {¶ 51} We, therefore, conclude that the trial court did not abuse its discretion in limiting cross-examination on this issue. Accordingly, appellant's second assignment of error is overruled.
 {¶ 52} Having overruled both of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Klatt, P.J., and Brown, JJ., concur.