OPINION
{¶ 1} Defendant-appellant, Kenneth J. Horsley, appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of one count of menacing by stalking, a misdemeanor of the first degree. For the following reasons, we affirm the judgment of the Franklin County Court of Common Pleas.
 {¶ 2} By indictment filed on May 20, 2005, defendant was charged with two counts of menacing by stalking, violations of R.C. 2903.211 and felonies of the fourth degree. Defendant pled not guilty to the charges in the indictment, and a jury trial was later held.
 {¶ 3} Following the state's case-in-chief and over the state's objection, the trial court granted defendant's motion for acquittal as to count two of the indictment. After deliberating, the jury returned a verdict of guilty as to count one of the indictment, and the jury also found that defendant did not have a history of violence toward the victim. Because of this, through a corrected judgment entry, the trial court convicted defendant of menacing by stalking, a misdemeanor of the first degree. The trial court also imposed a 180-day sentence at the Franklin County Corrections Center. Additionally, the trial court denied a motion by defendant to stay execution of his sentence pending appeal of his case.
 {¶ 4} From the trial court's judgment, defendant now appeals and assigns three errors for our consideration:
1. The verdict of guilty was against the manifest weight of the evidence.
2. The verdict of guilty was not supported by legally sufficient evidence.
3. Kenneth Horsley was deprived of the effective assistance of counsel.
 {¶ 5} In his first and second assignments of error, defendant asserts his conviction was against the manifest weight of the evidence and was supported by legally insufficient evidence. Because defendant's first and second assignments of error are interrelated, we shall jointly address them.
 {¶ 6} When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier-of-fact to find the essential elements of the offense beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89; State v.Thompkins (1997), 78 Ohio St.3d 380, 386, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. See, also, State v. Woodward,
Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489, 2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428, 2004-Ohio-6585 (observing that in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, rather "we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime").
 {¶ 7} By comparison, when presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt.Thompkins, at 387; Conley; State v. Group,98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. "The question for the reviewing court [in a manifest-weight claim] is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, Thompkins, at 387.
 {¶ 8} In the present case, count one of the indictment alleged that defendant had a history of violence toward Ms. Kyle Fugitt. Count one of the indictment further alleged that from or about October 8, 2004 to January 3, 2005, defendant committed menacing by stalking, a felony of the fourth degree, by engaging in a pattern of conduct that knowingly caused Ms. Fugitt to believe that defendant would cause physical harm or mental distress to her. After the jury found that defendant did not have a history of violence toward Ms. Fugitt, defendant was convicted of menacing by stalking, a misdemeanor of the first degree.
 {¶ 9} R.C. 2903.211 provides, in part:
(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.
* * *
(B) Whoever violates this section is guilty of menacing by stalking.
See, also, R.C. 2903.211(B)(1) (providing that "[e]xcept as otherwise provided in divisions [B][2] and [3] of this section, menacing by stalking is a misdemeanor of the first degree"); R.C.2901.01(A)(3) (defining "physical harm to persons");[1]
R.C. 2901.22(B) (defining culpable mental state of "knowingly").[2] Cf. R.C. 2903.211(B)(2) and (3) (circumstances constituting "menacing by stalking" as a felony of the fourth or fifth degree).
 {¶ 10} Under R.C. 2903.211, to prove the crime of menacing by stalking, the prosecution is required to prove beyond a reasonable doubt that a defendant (1) by engaging in a pattern of conduct, (2) knowingly, (3) caused another to believe that the offender would cause physical harm or mental distress to the other person. State v. Bone, Franklin App. No. 05AP-565,2006-Ohio-3809, at ¶ 23, citing State v. Dario (1995),106 Ohio App.3d 232, 238. See, also, R.C. 2903.211.
 {¶ 11} R.C. 2903.211(D)(1) defines the term "pattern of conduct" as used in R.C. 2903.211. R.C. 2903.211(D)(1) provides, in part, that "pattern of conduct" "means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents. * * * [P]attern of conduct establishes how present behavior which is apparently innocent can be deemed threatening based on prior encounters between the parties." Bone, at ¶ 25, quoting Statev. Shue, Cuyahoga App. No. 84007, 2004-Ohio-5021, at ¶ 16, appeal not allowed (2005), 105 Ohio St.3d 1452, 2005-Ohio-763, citing State v. Tichon (1995), 102 Ohio App.3d 758, 768, dismissed, appeal not allowed, 73 Ohio St.3d 1450. Because R.C.2903.211 does not define the phrase "closely related in time," whether incidents at issue are closely related in time is an issue for the trier-of-fact to resolve. Bone, at ¶ 24, citingDario, at 238.
 {¶ 12} The term "mental distress" as used in R.C. 2903.211
also is statutorily defined. According to R.C. 2903.211(D)(2), "mental distress" "means any of the following: (a) [a]ny mental illness or condition that involves some temporary substantial incapacity; (b) [a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." In State v.Horsley, Franklin App. No. 05AP-350, 2006-Ohio-1208, at ¶ 48, this court explained:
Substantial incapacity does not mean that the victim must be hospitalized, or totally unable to care for [oneself]. Incapacity is substantial if it has a significant impact upon the victim's daily life. The inability to sleep or concentrate on one's work is substantially incapacitating to that person. Additionally, an inability to sleep or concentrate for a protracted period of time is a condition that normally would require some form of mental health services to overcome. * * *
 {¶ 13} Pursuant to R.C. 2903.211(E), "[t]he state does not need to prove in a prosecution under this section that a person requested or received psychiatric treatment, psychological treatment, or other mental health services in order to show that the person was caused mental distress as described in division (D)(2)(b) of this section."
 {¶ 14} Furthermore, in a prosecution of menacing by stalking under R.C. 2903.211, expert testimony is not required. Horsley,
at ¶ 46; Tichon, at 763; see, also, State v. Bilder (1994),99 Ohio App.3d 653, 665, dismissed, appeal not allowed (1995),72 Ohio St.3d 1518 (finding that "[e]xpert testimony is not required to establish the existence of mental distress for purposes of Akron City Code 135.09" menacing by stalking).
 {¶ 15} At trial, among the evidence propounded by the state, the state presented the testimony of these witnesses: Ms. Fugitt; Mr. Jeff Howard; Ms. Tina Stevens; Mr. Mark Ealy; and Mr. Allen Mozek. Defendant did not call any witnesses to testify on his behalf.
 {¶ 16} According to Ms. Fugitt, she and defendant previously had an approximately five-year relationship, which "could get very bad occasionally." (Tr. Vol. I, 29.) When queried what she meant by "very bad," Ms. Fugitt testified: "We just had a lot of disagreements, and [defendant] would get very angry sometimes." Id.
 {¶ 17} Ms. Fugitt recalled an incident in which she observed defendant with another woman at a club. Id. at 109. After observing defendant with another woman, Ms. Fugitt became angry and yelled. Id. at 110. Defendant then took Ms. Fugitt to an alley behind a building where he slapped her "very, very hard," (id.), which resulted in her lip becoming bloodied and made her feel "really scared." Id. at 29-30. Because Ms. Fugitt did not want "to get him in any more trouble or get him angry," she did not pursue the matter, even though she had informed a police officer about the slapping incident. Id.
 {¶ 18} At one point, Ms. Fugitt and defendant began living together. Id. Later, Ms. Fugitt conceived a child by defendant and bore a daughter. Id. at 30-31. According to Ms. Fugitt, following the birth of the couple's daughter in July 2000, her relationship with defendant deteriorated. Id. at 32. Ms. Fugitt testified:
When [our daughter] was very small, and I'm not sure exactly how old she was, but she was very small, and [defendant] was gone for long hours. And he came home, and I was upset and we would get into an argument. And he took a wet towel out of the bathroom and he wound it up and snapped me in the face with it. And that was another, really it was, I mean that was really, I stopped right there, because I was really afraid, you know, because I had [my daughter] there and she was little, and I got really scared at that point. * * *
Id. at 33-34.
 {¶ 19} Ms. Fugitt testified that she feared defendant because his behavior was becoming "more erratic" and "less predictable." Id. at 34-35. Ms. Fugitt also testified about additional incidents of violence between defendant and her. Ms. Fugitt testified: "There were a couple of times, which I can't pinpoint, when we had had arguments when he would grab my hair, and pull me, pull me around. And I don't remember specifically when those happened, just during maybe different fights that we had around that time." Id. at 35.
 {¶ 20} According to Ms. Fugitt, she did not call the police following these incidents. Id. Ms. Fugitt testified: "[T]here were a couple of times that I had said I was going to [call the police], and he would pull the phone out of the wall and take the cord and leave. He stomped on my cell phone one time and crushed it into a million pieces. So, no, I didn't call." Id. at 35-36.
 {¶ 21} Ms. Fugitt testified that she and her daughter eventually moved to her parents' home in late February or early March 2003, and she later began a relationship with Mr. Allen Mozek. Id. at 36. While Ms. Fugitt lived with her parents, defendant occasionally would see his daughter. Id. at 37. Ms. Fugitt also testified that she and defendant "wouldn't talk on the phone very much. When we did talk we would have a lot of arguments and, you know, he would be telling me that I need to bring her over right now or, you know, things lke [sic] that. And that was — that was basically how it was at that point." Id.
 {¶ 22} Ms. Fugitt further testified that defendant "told me that if I ever tried to keep his daughter away from him, that I wouldn't be around any more. And not to cross him." Id. at 38. According to Ms. Fugitt, she construed defendant's statement as follows: "I assumed he was going to hurt me badly physically, or kill me, whatever. I couldn't — I didn't really know what he, what extent at that time. I mean, he was making it very clear at that point that I knew what he meant." Id. According to Ms. Fugitt, while she lived with her parents, defendant "began to get angrier and angrier. And he left me just, I mean he would call and leave me messages threatening me, and he was just very angry." Id. at 38-39.
 {¶ 23} Ms. Fugitt eventually contacted the prosecutor's office to file charges against defendant. According to Ms. Fugitt, defendant was later charged and convicted of telephone harassment.[3] Id. at 39-40. Although she did not testify at defendant's trial in the Franklin County Municipal Court, Ms. Fugitt testified that she was still "[n]ervous," "[b]ecause I knew at that point that I was really making him angry. I knew that he was blaming me for that, and that I was going to be making him angry." Id. at 42.
 {¶ 24} According to Ms. Fugitt, after defendant escaped from "house arrest," he came to her workplace and told her to meet him outside. Id. at 45. Ms. Fugitt refused to meet defendant. Later Ms. Fugitt informed her employer's security department, her work supervisor, and a receptionist of this incident. Id. at 47. According to Ms. Fugitt, defendant was rearrested and later sent to prison. While defendant was incarcerated, Ms. Fugitt began to receive letters and telephone calls from defendant. Id.
 {¶ 25} According to Ms. Fugitt, defendant's letters to her "sometimes went from being nice at the beginning, and then at the end they would be very demanding and threatening." Id. at 50. After receiving defendant's letters, Ms. Fugitt spoke with the "stalking coordinator" in the Municipal Court building and surrendered the letters to the stalking coordinator. Id. at 51. Defendant was later convicted of menacing by stalking and he was sentenced to six months in jail. Id. at 52.
 {¶ 26} According to Ms. Fugitt, after this conviction, defendant continued to write letters to her. Id. at 53. Ms. Fugitt testified that from October through December 2004, she also received at her place of employment letters from other inmates at Pickaway Correctional Institution concerning an alleged pen pal program that Ms. Fugitt purportedly coordinated. Id. at 54, 56, 88. At the time that Ms. Fugitt began to receive letters from inmates at the Pickaway Correctional Institution, defendant was an inmate at this same correctional facility. Id. at 54.
 {¶ 27} Ms. Fugitt testified that after she began to receive these letters she felt "helpless" because "they — nobody could get him to stop." Id. at 57. Ms. Fugitt testified that, after she continued to receive these letters, most of which were clearly marked as inmate correspondence, she felt "nervous" after receiving one of the letters. Id. at 62. Ms. Fugitt testified: "I * * * felt that my employer, if somebody, the wrong person saw that letter coming through to me, that I would, could get in trouble, fired." Id. at 62. Ms. Fugitt also testified that, after receiving the inmate letters, she felt: "Embarrassed and nervous. Now that I knew that all of those inmates had my address and thought that I was running a pen pal program, I was really scared." Id. at 71.
 {¶ 28} In October 2004, Ms. Fugitt also received a letter from defendant. Id. at 808-1. According to Ms. Fugitt, in this letter defendant informed her that if she did not respond to his correspondence, then he would forward copies of the letter to three different departments at her employer so that these departments would forward the letter to her. Id. at 82. Instead of responding to defendant's correspondence, Ms. Fugitt brought defendant's letter to the city prosecutor's stalking unit. Id.
 {¶ 29} In correspondence dated December 27, 2004, from Cincinnati, Ohio, a small sheet of paper with a biblical reference to Ezekiel 25:17 was sent to Ms. Fugitt at her employer's address. (Id. at 83-84; exhibit Nos. 14A and 14B.) According to Ms. Fugitt, she could see that defendant's name on the return address had been "scribbled off with a pen." Id. at 125. Ms. Fugitt testified that after receiving this letter, she thought "Kenny's entire family lives in Cincinnati, so he's given a letter for them to mail to me." Id. at 83-84. Ms. Fugitt also testified that in the past she had received biblical verses from defendant. Id. at 136.
 {¶ 30} When Ms. Fugitt saw this correspondence, she became "terrified." Id. at 84. She testified that she became terrified "[b]ecause I — it seemed very ominous to open an envelope with a Biblical verse inside. I knew it was from him, and I knew I had to look up the Bible verse, and I knew that he was trying to find a way around making it look like it came from him. And I knew it was serious." Id. After receiving the letter, Ms. Fugitt found and read the biblical passage. When asked what the passage stated, Ms. Fugitt testified: "I don't remember verbatim, but I know that it said that, that God will take great vengeance on people, and they will know that — it's something like that. They will know I'm the Lord when I wreak my vengeance on them, or something to that effect." Id. According to Ms. Fugitt, after reading this passage, she "thought that [defendant] was going to come after me and kill me when he gets out of jail." Id. at 85.
 {¶ 31} Ms. Fugitt also testified that at about the end of December 2004, during a period of approximately five to seven days, she received telephone calls at her home from the prison at a rate of approximately two calls per hour. Id. at 89-91. When she answered these calls, a recording announced that she had a call from defendant, who was then an inmate at the Pickaway Correctional Institution. As a result of receiving these telephone calls, Ms. Fugitt placed a "block" on her phone line and later changed her telephone number. Id. at 90-91.
 {¶ 32} Ms. Fugitt also spoke with prison officials about the unwanted telephone calls from defendant and the unwanted correspondence from other inmates. Id. at 92-93. Later, Ms. Fugitt sought and was granted a protection order. Id. at 93. Additionally, Ms. Fugitt arranged to have her will drafted; she went through training to allow her to carry a concealed weapon; and she purchased a handgun. Id. at 94-95.
 {¶ 33} After Ms. Fugitt was granted a protection order, she still received correspondence from defendant through another inmate. Id. at 97-98. Ms. Fugitt testified that in this letter dated March 21, 2005, defendant asked Ms. Fugitt to talk the trial judge "into going light on his sentence," and he stated that "if [his] family would give him money he would go to California and never come back." Id. at 98-99. In another letter from defendant to Ms. Fugitt's employer, defendant discussed how Ms. Fugitt purportedly abused her own daughter; defendant alleged that Ms. Fugitt stole from her employer and that she enticed defendant to rob her employer; and defendant asked Ms. Fugitt's employer to administer a lie detector test to Ms. Fugitt. Id. at 101.
 {¶ 34} Ms. Fugitt testified that since these events, she "just spend[s] a lot time just obsessing about what's going to happen when [defendant] gets released, and just under a lot of stress. I have a very hard time sleeping. I've put alarms on all of the windows and doors. I call the jail sometimes just to make sure he's still in there. It's just — its been really hard." Id. at 102-103. Ms. Fugitt testified that although she had not sought psychiatric counseling, she had gone to her physician and inquired whether he could prescribe something for her. According to Ms. Fugitt, her physician prescribed anti-depressants for her. Id. at 103.
 {¶ 35} Ms. Fugitt also testified that these events had impacted her relationship with her current boyfriend. Ms. Fugitt testified:
* * * [I]t's really put a stress on it because I'm constantly getting up in the middle of the night and checking things, and checking on [my daughter]. And calling the jail at crazy hours trying to, you know, make sure that he's not been transferred. I mean, I'm registered with VINES, but I just am afraid that I'm going to miss it and, you know, he'll get released or — .
Id.[4]
 {¶ 36} Ms. Fugitt testified that these events had impacted her work performance, and stated: "I mean, I was — for a while I was constantly on telephone calls because I was constantly calling people. I've tried not to make it affect it. I'm so scared of losing my job, because I have to have an income for my daughter. I'm, you know, a single mother. So I try not to talk about it to people there, and I've really tried to play it down to them so they don't get nervous." Id. at 104.
 {¶ 37} Ms. Fugitt further testified that these events had impacted her relationship with her immediate family. She testified: "It's everybody is just really — everybody is really nervous about the day that, when he gets out." Id. Ms. Fugitt also testified that she intended to move again "because I feel that's something that I need to do." Id. Mr. Jeff Howard is an investigator at the Pickaway Correctional Institution. Id. at 140. Mr. Howard testified that he became acquainted with Ms. Fugitt after she contacted him. Id. at 144. Mr. Howard testified:
She called me. She called me at the institution. She identified herself. She said that she had, you know, she knew that somebody was here that was the father of her child, pretty much is how she identified him. She gave his name and said that she — he's not to attempt to contact her, and that she doesn't want to have any contact with him. Of course, you know, I asked her if he had had conversations with her, with him. She said that she hangs up the phone when he calls, and she's tired of getting calls. So from there I related that information primarily to our victim advocate of the institution.
Id.
 {¶ 38} After receiving the telephone call from Ms. Fugitt, Mr. Howard also checked the prison's telephone records and confirmed Ms. Fugitt's allegations. Id. at 144-155. In a separate telephone call, Ms. Fugitt contacted Mr. Howard about unwanted letters that she had been receiving from Pickaway Correctional Institution. Id. at 155. Mr. Howard instructed Ms. Fugitt to forward the unwanted letters to him and he would investigate the matter. Id. at 158.
 {¶ 39} Mr. Howard testified that he interviewed defendant about Ms. Fugitt's complaints. Id. at 174. According to Mr. Howard, during this interview, defendant admitted that he provided Ms. Fugitt's name as a contact for a pen pal program. Id.
 {¶ 40} Mr. Howard also testified that defendant had been placed in segregation for 15 days due to violations of administrative regulations. According to Mr. Howard, because defendant did not have access to a telephone while in segregation, three calls to Ms. Fugitt that were attributed to defendant's personal identification number during defendant's stay in administrative segregation were, as a consequence, made by another person or persons. Id. at 175-176, 180, 181-182.
 {¶ 41} Ms. Tina Stevens is employed as a "job coordinator" and a "victim coordinator" at Pickaway Correctional Institution. In her capacity as "victim coordinator," Ms. Stevens serves as a liaison with the prison's Office of Victim's Services, and, at times, she issues direct orders to inmates to cease and desist, which requires inmates to stop corresponding with a party who has requested no contact with an inmate. Id. at 1881-89. Ms. Stevens confirmed that a cease and desist order was issued to defendant, and because defendant later violated this order, he was placed in administrative segregation. Id. at 194-195.
 {¶ 42} Mr. Mark Ealy is an investigator with the Columbus City Prosecutor's Office, Stalking Unit. (Tr. Vol. II at 228.) Mr. Ealy testified that Ms. Fugitt had contacted him to complain about defendant's conduct, and when he interviewed Ms. Fugitt, she was upset and "near tears." Id. at 230-231. Mr. Ealy further testified: "And then, on several subsequent conversations that I had with her, she had expressed that she was considering moving out of the state, quitting her job that she had for some time, and moving out of the state because she knew that he was going to get out eventually and he would never leave her alone." Id. at 231-232. "[Ms. Fugitt] was very upset, she was nervous, flighty, she kept reiterating that she was very afraid of him and afraid that when he got out that he was never going to leave her alone. She told me that she had obtained a concealed carry permit because she was afraid of him when he got out." Id. at 250.
 {¶ 43} After receiving Ms. Fugitt's complaint, Mr. Ealy went to Pickaway Correctional Institution and collected the inmate letters that Ms. Fugitt had forwarded to Mr. Howard. Id. at 232. While conducting his investigation, Mr. Ealy also interviewed Mr. Howard, Ms. Stevens, and he later interviewed defendant at the Franklin County Jail. Id. at 235, 238.
 {¶ 44} According to Mr. Ealy, during his interview of defendant, defendant denied informing Mr. Howard that he had any involvement with a pen pal program at the prison. Id. at 243. Defendant also denied any involvement with sending a letter that contained a biblical reference from Ezekiel. Id. at 245. Defendant did, however, admit to sending a letter dated October 22, 2004, to Ms. Fugitt in which he discussed the topic of child abuse, id. at 243-244, and he also admitted to sending a letter to the board of directors of Ms. Fugitt's employer. Id. at 248. Claiming that anyone could obtain his personal identification number and code, defendant denied telephoning Ms. Fugitt from prison. Id.
 {¶ 45} Mr. Allen Mozek, Ms. Fugitt's current boyfriend, testified that he, Ms. Fugitt, and her daughter reside together. Id. at 264, 266. According to Mr. Mozek, when Ms. Fugitt received inmate letters regarding a pen pal program, she became "very upset." Id. at 267. Mr. Mozek testified: "She can't seem to concentrate. She's worried that things that could happen, is very upset. You know, at nighttime she would check the windows, check the doors. She's very uneasy." Id. Mr. Mozek further testified: "Just she would cry. She would pace the floors, just not have happy. You know, just very worried about what could happen." Id. Also according to Mr. Mozek, Ms. Fugitt's hands would "shake." Id.
 {¶ 46} According to Mr. Mozek, at the time that letters were sent to Ms. Fugitt's work supervisors, she "was very worried that she was going to lose her job. She was very concerned about what people were thinking about her. And crying and shaking a lot during that time. Very upset." Id. at 269. Mr. Mozek also testified that when Ms. Fugitt received telephone calls from the prison, "[s]he was — she would be very upset once again, and crying. Very impatient, you know, she didn't know why, you know, all of this stuff was happening. And just upset and crying." Id. at 270.
 {¶ 47} Construing the evidence in favor of the prosecution, we find that a jury reasonably could conclude beyond a reasonable doubt that defendant by engaging in a pattern of conduct knowingly caused Ms. Fugitt to believe that defendant would cause her physical harm or mental distress. In the present case, direct evidence and reasonable inferences drawn from this evidence, if believed by the jury, as the trier-of-fact, support a finding that during the period of October 8, 2004 through January 3, 2005, defendant attempted several times to contact Ms. Fugitt by telephone before he was placed in administrative segregation; defendant sent Ms. Fugitt a letter postmarked October 21, 2004, in which, among other things, he threatened to send correspondence to her employer containing suggestions that Ms. Fugitt confided in him allegations about past child abuse by family members; defendant, who in the past had sent biblical verses to Ms. Fugitt and who has family in Cincinnati, Ohio, was involved with sending the letter to Ms. Fugitt that contained the biblical reference to Ezekiel 25:17; and defendant falsely suggested to other inmates that Ms. Fugitt was directing a "pen pal" program and provided these inmates with Ms. Fugitt's name and her employer's address.
 {¶ 48} Based on Ms. Fugitt's testimony, Mr. Mozek's testimony, and Mr. Ealy's testimony, the jury also reasonably could conclude beyond a reasonable doubt that defendant's pattern of conduct knowingly caused Ms. Fugitt to have a condition that involved some temporary substantial incapacity or that would normally require mental health services. Additionally, notwithstanding defendant's contention to the contrary, we cannot conclude that, in resolving evidentiary conflicts, the jury clearly lost its way and created a manifest miscarriage of justice such that defendant's conviction must be reversed.
 {¶ 49} Accordingly, for the foregoing reasons, we hold that defendant's conviction is supported by legally sufficient evidence and his conviction is not against the manifest weight of the evidence. Therefore, we overrule defendant's first and second assignments of error.
 {¶ 50} Defendant's third assignment of error asserts he was denied the effective assistance of trial counsel. Here, defendant asserts, among other things, that defense counsel's decision to "reserve" and waive opening statement; defense counsel's failure to object to improper questions; defense counsel's failure to adequately address weaknesses in the state's case; defense counsel's failure to call witnesses to the stand; and defense counsel's failure to advocate for additional jail-time credit for which defendant arguably was entitled, constitute ineffective assistance of counsel.
 {¶ 51} In State v. Morales, Franklin App. No. 03AP-318,2004-Ohio-3391, at ¶ 24, this court stated:
* * * To demonstrate ineffective assistance of counsel, defendant first must show that counsel's performance was deficient, which requires showing that counsel made errors so serious counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Strickland v. Washington
(1984), 466 U.S. 668, 686, 104 S.Ct. 2052[.] * * * Second, defendant must demonstrate that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Id. Unless defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. Id.
See, also, Wiggins v. Smith (2003), 539 U.S. 510, 521,123 S.Ct. 2527 (discussing Strickland).[5]
 {¶ 52} When reviewing a defendant's claim of ineffective assistance of counsel, an appellate court's scrutiny of defense counsel's performance must be highly deferential. InStrickland, supra, at fn. 5, the Supreme Court of the United States explained:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." * * * There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. * * *
Id. at 689.
 {¶ 53} Whether trial counsel decides to not make an opening statement "is a tactical decision that will not ordinarily rise to the level of ineffective assistance of counsel." State v.Addison, Franklin App. No. 03AP-1102, 2004-Ohio-5154, at ¶ 13, citing State v. Williams (1991), 74 Ohio App.3d 686, dismissed, jurisdictional motion overruled, 62 Ohio St.3d 1463, rehearing denied (1992), 62 Ohio St.3d 1497. In this case, defendant presented no evidence in his case-in-chief. Preferring to provide a closing argument, defense counsel waived opening statement after earlier "reserving" opening statement. We cannot conclude such a tactical decision shows an error so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. See, State v. Matthews, Franklin App. No. 03AP-140, 2003-Ohio-6307, at ¶ 30 (observing that "[b]y not presenting evidence in the case-in-chief, defense counsel obviated the need for an opening statement. The decision not to make an opening statement is a tactical decision that will not ordinarily rise to the level of ineffective assistance of counsel").
 {¶ 54} Without specifically identifying in the record purported instances of error, defendant also asserts that trial counsel's failure to object to improper questions concerning witnesses' states of mind also constitutes ineffective assistance of counsel. Because defendant fails to properly reference portions of the record supporting his claim that defense counsel's failure to object constitutes error, defendant cannot demonstrate these claimed instances of error. See Daniels v.Santic, Geauga App. No. 2004-G-2570, 2005-Ohio-1101, at ¶ 13-15. See, also, App.R. 12(A)(2) and 16(A)(7); Graham v. City ofFindlay Police Dept. (Mar. 19, 2002), Hancock App. No. 5-01-32 (stating that "[t]his court is not obliged to search the record for some evidence of claimed error. * * * Rather, an appellant must tell the appellate court specifically where the trial court's alleged errors may be located in the transcript"); Stateex rel. Physicians Commt. for Responsible Medicine v. Ohio StateUniv. Bd. of Trustees, 108 Ohio St.3d 288, 2006-Ohio-903, at ¶13; State ex rel. Petro v. Gold, 166 Ohio App.3d 371,2006-Ohio-943, at ¶ 94, appeal not allowed, 110 Ohio St.3d 1439,2006-Ohio-3862, reconsideration denied, 111 Ohio St.3d 1418,2006-Ohio-5083; Porter v. Keefe, Erie App. No. E-02-018,2003-Ohio-7267, at ¶ 109-113.
 {¶ 55} Defendant further asserts that defense counsel's failure to assert a claim that R.C. 2903.211 is unconstitutionally vague when he moved for acquittal under Crim.R. 29, and defense counsel's failure to adequately address unspecified weaknesses in the state's case, constitute ineffective assistance of counsel. We disagree.
 {¶ 56} Because all statutes designed to promote the public health, safety, and welfare enjoy a strong presumption of constitutionality, State v. Anderson (1991), 57 Ohio St.3d 168,171, certiorari denied, 501 U.S. 1257, 111 S.Ct. 2904; State exrel. Jackman v. Court of Common Pleas of Cuyahoga Cty. (1967), 9 Ohio St.2d 159, 161; State v. Schwab (1997),119 Ohio App.3d 463, 468, citing Anderson, supra, and because "`the party asserting that a statute is unconstitutional must prove this assertion beyond a reasonable doubt in order to prevail.'"Schwab, at 468, quoting State v. Collier (1991),62 Ohio St.3d 267, 269; Anderson, at 171, under the facts and circumstances of this case, defense counsel reasonably could have decided against challenging the constitutionality of R.C.2903.211 in a Crim.R. 29 motion, especially as R.C. 2903.211 has been found by some appellate courts to not be unconstitutionally vague. See Schwab; Dario; see, also, State v. Francway
(Aug. 17, 1995), Cuyahoga App. No. 68116, dismissed, appeal not allowed (1996), 74 Ohio St.3d 1498. Moreover, because defendant fails to specify purported weaknesses in the state's case that defendant claims defense counsel should have raised, defendant cannot demonstrate how defense counsel's failure to raise these unspecified weaknesses constitutes error. See Daniels, at ¶ 13-15.
 {¶ 57} Defendant also asserts that counsel's failure to call witnesses to the stand constitutes ineffective assistance of counsel. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." State v. Treesh (2001),90 Ohio St.3d 460, 490, certiorari denied, 533 U.S. 904,121 S.Ct. 2247, citing Williams, at 695; see, also, Matthews, at ¶ 31 (observing that "failure to call a witness is not ineffective assistance if calling that witness opens the door to unfavorable testimony that counsel might reasonably conclude would likely outweigh the value of any favorable testimony the witness might offer"). Here, although defendant asserts defense counsel erred by not calling witnesses to the stand, defendant fails to show how counsel's decision prejudiced him. Under such facts and circumstances, we cannot conclude that defense counsel was ineffective because he failed to call witnesses to the stand in defendant's defense.
 {¶ 58} Finally, defendant asserts that defense counsel's failure to advocate for additional jail-time credit for which defendant arguably was entitled constitutes ineffective assistance of counsel. In Strickland, the United States Supreme Court stated that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Based on the record before this court, we cannot determine whether the trial court's computation of jail-time credit was error and, therefore, defendant cannot show that he was prejudiced or that defense counsel's conduct failed to fall within the wide range of reasonable professional assistance. Under the facts and circumstances of this case, we therefore cannot conclude that defense counsel's failure to advocate for additional jail-time credit constitutes ineffective assistance of counsel.
 {¶ 59} Accordingly, for the foregoing reasons, we overrule defendant's third assignment of error. Furthermore, having overruled defendant's first, second, and third assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and Sadler, JJ., concur.
[1] R.C. 2901.01(A)(3) defines "physical harm to persons" as "mean[ing] any injury, illness, or other physiological impairment, regardless of its gravity or duration."
[2] R.C. 2901.22(B) defines "knowingly" as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
[3] Among the state's exhibits that were admitted into evidence are copies of: (1) judgment entry in State v. Horsley, Franklin County Municipal case No. 2003-19594 (convicting defendant of telephone harassment); a judgment entry in State v. Horsley,
Franklin County Court of Common Pleas case No. 04CR03-1472 (convicting defendant of escape); and (3) judgment entry inState v. Horsley, Franklin County Municipal Court case No. 2004 CRB 031191-1 (convicting defendant of one count of menacing by stalking). See, also, State v. Horsley, Franklin App. No. 05AP-350, 2006-Ohio-1208 (affirming defendant's conviction in Municipal Court case No. 2004 CRB 031191-1).
[4] Ms. Fugitt testified that "VINES" is the "Victim Notification System." Id. at 103. According to Ms. Fugitt, the VINES system is activated when the status of an inmate changes or if an inmate is transferred. Id.
[5] In Wiggins, at 521, the Supreme Court of the United States stated:
We established the legal principles that govern claims of ineffective assistance of counsel in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. Id., at 687, 104 S.Ct. 2052. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id., at 688, 104 S.Ct. 2052. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Ibid.