[Cite as *State v. Kearns*, 2016-Ohio-5941.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,                 :            No. 15AP-244
                                                            (C.P.C. No. 14CR-962)

v.                                                    :

                                                            (REGULAR CALENDAR)

Sheila Kearns,                                  :

      Defendant-Appellant.               :

---

D E C I S I O N

Rendered on September 22, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Oglesby & Oglesby*, and *Geoffrey L. Oglesby*, for appellant. **Argued:** *Geoffrey L. Oglesby*.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Sheila Kearns, appeals from a judgment of the Franklin County Court of Common Pleas finding her guilty, pursuant to a jury verdict, of four counts of disseminating matter harmful to juveniles, in violation of R.C. 2907.31, felonies of the fifth degree. Because we find the trial court did not err or commit plain error, and the verdict was supported by sufficient evidence and was not against the manifest weight of the evidence, we affirm.

## I. Facts and Procedural History

{¶ 2} On February 26, 2014, plaintiff-appellee, State of Ohio, indicted appellant on five counts of disseminating matter harmful to juveniles, in violation of R.C. 2907.31, felonies of the fifth degree. The indictment alleged that appellant, "with knowledge of its character or content, did recklessly * * * furnish, * * * exhibit, * * * or present to a * * * group of juveniles, * * * to wit: East High School Class * * *: Spanish 3 [2, 3, 2, 2], Period 2

[3, 6, 7, 8], any material or performance that is *obscene* or harmful to juveniles, the said [class] being thirteen (13) years of age or older, to wit: thirteen to seventeen (13-17) years of age." (Emphasis added.)  (Indictment at 1.)

{¶ 3}    The events giving rise to the indictment occurred on April 11, 2013 at East High School in Columbus, Ohio.   While serving as a permanent substitute teacher, appellant showed the movie "*The ABC's of Death*" to five Spanish language classes.  The movie opens with the following statement: "The following feature film was created by 26 directors from around the world.  Each director was given a letter of the alphabet and asked to choose a word.  They then created a short tale of death that related to their chosen word.   They had complete artistic freedom regarding the content of their segments." (State's Ex. A.)    Following this statement were 26 short vignettes corresponding to each letter of the alphabet.   The vignettes depicted, simulated, or implied very graphic violence; blood and gore; activities involving bodily functions of elimination; cruelty to animals; anal or vaginal sex or other penetration, masturbation, sadomasochism, prostitution, and, most disturbingly, child molestation and rape.

{¶ 4}    Immediately after one of the classes, students reporting to choir class appeared "excited, appalled [and in] disbelief about what they had seen."  (Tr. Vol. I at 29.)  This prompted the teacher, Elizabeth Carle, to tell the assistant principal, Carl D. Chamberlain, that he should look into this because the movie being shown in Spanish class was "inappropriate."  (Tr. Vol. I at 34.)  Chamberlain went to check on appellant's eighth period class.  When he entered the room, the movie was being projected on a screen.  Chamberlain testified that he walked in and sat down.  He observed a scene involving a surf board and implied drowning.  Then, appellant fast-forwarded through several scenes.  The fast-forwarding stopped and Chamberlain saw "[bare] female breasts show[ing] on the screen."  (Tr. Vol. I at 65-66.)  At that point, Chamberlain directed appellant to stop the movie and remove it from the DVD player.

{¶ 5}    Chamberlain took the DVD and, along with the school safety and security specialist, viewed the DVD to see what the students had been watching.  Chamberlain did not watch the entire movie because the last scene he watched "was a simulation of child rape, and that was where [he] had to stop."  (Tr. Vol. I at 67.)  Chamberlain informed the school principal, who in turn removed appellant from the classroom and informed the school superintendent, Franklin County Children Services, and Columbus Police Officer Alan Blackmon, the school resource officer.   Blackmon contacted Columbus Police

Detective Lolita Perryman of the Exploited Children's Unit. Chamberlain interviewed appellant at the end of the day. Appellant admitted to showing the movie to five of her classes, but stated that no one class saw the entire movie. Rather, she began the movie with each class where she left off with the previous class. Appellant reported to Chamberlain that the entire movie had been seen at least collectively by her five classes. Classes at East High School run approximately 47 minutes each. Chamberlain testified there were minor children in each class. The movie, in its entirety, without the credits was 1 hour, 58 minutes, and 14 seconds.

{¶ 6} Trial commenced on January 12, 2015 and continued through January 15, 2015. The jury returned verdicts of guilty on four of the five counts of disseminating matter harmful to juveniles, all being felonies of the fifth degree. The jury entered a not guilty verdict on the first count in the indictment, corresponding to the first class in which appellant showed the movie. The verdict forms presented to the jury for Counts 2 through 5 included the following statement: "We further find that the material displayed **was/was not** (circle one) obscene." (Emphasis sic.) On each of the verdict forms, the jury circled the term "was" indicating that they found the material to be obscene.

{¶ 7} On March 4, 2015, the court sentenced appellant to a period of three years of community control. As a requirement of community control, the court required appellant to serve 90 days at the Franklin County Corrections Center, said days stayed upon the filing of this appeal. As a further condition of community control, appellant was required to surrender her teacher's certificate. The court further indicated that if appellant violated the terms of community control, she would receive a prison term of eight months on each count to be served consecutive to each other.

## II. Assignments of Error

{¶ 8} Appellant appeals and assigns the following six assignments of error for our review:

> [I.] THE COURT ERRED AND ABUSED ITS DISCRETION BY GIVING A "MOTIVE INSTRUCTION" BUT NOT ALLOWING COUNSEL TO QUESTION WITNESSES REGARDING MOTIVE.
>
> [II.] THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW.

[III.] THE TRIAL COURT, ERRED AND ABUSED ITS DISCRETION BY INCORRECTLY STATING THE LAW AS THE LAW RELATES TO A CULPABLE MENTAL STATE IN A JURY INSTRUCTION BY GIVING A DEFINITION OF "KNOWLEDGE" THAT WAS NOT IN EFFECT AT THE TIME OF THE ALLEGED OFFENSE.

[IV.] THE TRIAL COURT ERRED BY ALLOWING THE STATE OF OHIO [TO] "DEFINE" PRU[R]IENT INTEREST WHILE CURTAILING DEFENSE COUNSEL FROM REFERRING TO TERMS.

[V.] THE TRIAL COURT ERRED BY NOT GIVING AN INSTRUCTION ON AN AFFIRMATIVE DEFENSE.

[VI.] THE TRIAL COURT ERRED WHEN THE COURT FAILED TO GRANT APPELLANT'S MOTION FOR ACQUITTAL.

For ease of discussion, we address appellant's assignments of error out of order.

## III.  R.C. 2907.31 Disseminating Matter Harmful to Juveniles

{¶ 9}  R.C. 2907.31 states:

(A) No person, with knowledge of its character or content, shall recklessly do any of the following:

(1) Directly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene or harmful to juveniles.

{¶ 10} Also relevant, R.C. 2907.31(F) states:

Whoever violates this section is guilty of disseminating matter harmful to juveniles. If the material or performance involved is harmful to juveniles, except as otherwise provided in this division, a violation of this section is a misdemeanor of the first degree. *If the material or performance involved is obscene, except as otherwise provided in this division, a violation of this section is a felony of the fifth degree.*

(Emphasis added.)

{¶ 11} Appellant was convicted of four felonies of the fifth degree.  Therefore, pursuant to R.C. 2907.31(F), the jury in this case was required to find that the movie involved was not only harmful to juveniles, but also was obscene.

## IV. First Assignment of Error—Curtailing Line of Cross-Examination

{¶ 12} In her first assignment of error, appellant argues the trial court erred by giving a motive instruction to the jury and allowing the state to refer to motive in opening statements, yet not permitting cross-examination of Detective Perryman regarding whether she found any type of motive as to why appellant showed the movie to the students. Appellant argues that she should have been permitted to show "lack of motive." (Appellant's Reply Brief at 5.) In response, the state argues that the trial court properly instructed the jury on motive pursuant to Ohio Jury Instructions ("OJI") CR Section 417.01 and that there was no error in curtailing appellant's cross-examination of Detective Perryman because the question called for speculation, and motive need not be proven. Finally, the state argues that if there was error, it was not prejudicial because Detective Perryman testified that appellant showed the movie because she said it contained Spanish and she was going to discuss the Spanish alphabet.

{¶ 13} Cross-examination is permitted on all relevant matters and on matters affecting credibility. Evid.R. 611(B). However, a trial court has discretion to limit the scope of cross-examination taking into account the particular facts of a case. *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 55, citing *State v. Bone*, 10th Dist. No. 05AP-565, 2006-Ohio-3809, ¶ 49. Thus, a trial court has wide latitude to impose reasonable limits on cross-examination based on concerns that interrogation is repetitive or only marginally relevant. *Id.*, citing *State v. Treesh*, 90 Ohio St.3d 460, 480-81 (2001). A reviewing court " ' "should be slow to disturb a trial court's determination on the scope of cross-examination unless the trial court has abused its discretion and the party illustrates a material prejudice." ' " *Canada* at ¶ 55, quoting *Bone* at ¶ 49, quoting *State v. Hodge*, 10th Dist. No. 04AP-294, 2004-Ohio-6980, ¶ 10. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Rawson*, 10th Dist. No. 14AP-1023, 2016-Ohio-1403, ¶ 19, citing *State v. Clark*, 71 Ohio St.3d 466, 470 (1994). Proof of motive may be considered relevant evidence and therefore within the scope of cross-examination. However, evidence should not be composed of mere speculation, but of hard facts. *State v. Ward*, 10th Dist. No. 82AP-451 (Feb. 15, 1983).

{¶ 14} Appellant's counsel cross-examined the state's witness Detective Perryman regarding her interview of appellant. Appellant's counsel asked Detective Perryman whether "[d]uring the course of [her] investigation did [she] ever find any type of motive

as to why." (Tr. Vol. II at 193.) At this point, the state objected and immediately the court sustained the objection. Appellant's counsel continued cross-examination of Detective Perryman without expressing any objection to the court's sustaining the state's objection and without proffering the remainder of the question she was going to ask. Later, Detective Perryman testified that appellant "figured [the students] could count and go over the ABCs because [they were speaking Spanish in the movie]." (Tr. Vol. II at 229.) Furthermore, appellant's counsel asked Detective Perryman whether "[appellant] said to you that she did it for the Spanish class, correct?" Detective Perryman replied "[c]orrect." (Tr. Vol. II at 245.) This is consistent with appellant's own written statement to Chamberlain:

> A video title [sic] ABC of Death. A video in which Spanish is included in video which depicts each alphabet letter that we are studying for Spanish. Letters in video included different scenes from A-Z for different explanations of the alphabet. There was different letters of the alphabet that spoke Spanish with sub titles at bottom of screen depicting the Spanish being spoken.

(State's Ex. B.)

{¶ 15} We find that error, if any, in restricting cross-examination of Detective Perryman as to appellant's motive was harmless because ultimately Detective Perryman testified regarding appellant's reasons for showing the movie. Detective Perryman testified that appellant told her that she showed the movie to the class because it contained Spanish subtitles and addressed the Spanish alphabet. Crim.R. 52(A) states: "Harmless error. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Accordingly, we overrule the first assignment of error.

## V. Fourth Assignment of Error, in part—Curtailing Opening Statement

{¶ 16} Although not entirely clear, in her fourth assignment of error, appellant appears to argue, in part,[1] that the trial court erred by allowing the state to define an element of the offense, specifically the term "prurient," in closing argument, yet not permitting her counsel to refer to another element of the offense in opening statement. (Tr. Vol. II at 329.) Specifically, appellant complains that when her counsel stated,

---

[1] In addition to arguing that the trial court erred in curtailing her opening statement, appellant also argues in her fourth assignment of error that the court improperly instructed the jury by not defining the term "prurient interest" fully and completely. We address this part of appellant's fourth assignment of error below in our discussion of lack of jury instructions.

"[b]ecause the State of Ohio can not prove beyond a reasonable doubt that this was done in order for any type of sexual gratification on her part. You're talking about kids that are between 13 and 18," the court admonished the jury as follows:

> THE COURT: Now I would just remind counsel he's getting into some of the standard that will be part of the instructions that I give you. I will remind you two things. One, counsel, please be careful when you go into these areas. To the jury, I will give you the law. We talked about that at the very beginning of the case. And you must follow the law as I give it to you.

(Tr. Vol. I at 18.)

{¶ 17} The purpose of a defendant's opening statement is to briefly state the evidence that he or she intends to introduce in order to prove his or her defense. R.C. 2945.10(B). *See also State v. Dobrovich,* 7th Dist. No. 04 BE 56, 2005-Ohio-4688, ¶ 32. Though a trial court can permit counsel to anticipate and comment to a certain extent on an opponent's evidence under R.C. 2945.10, the trial judge has discretion to prevent confusion and waste of time. *State v. Collmar,* 10th Dist. No. 92AP-1663 (June 22, 1993).

{¶ 18} " 'An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument.' " *State v. Sage,* 10th Dist. No. 82AP-983 (Nov. 3, 1983), quoting *United States v. Dinitz,* 424 U.S. 600, 612 (1976) (Burger, C.J., concurring).

{¶ 19} We find the trial court did not abuse its discretion with its admonition to appellant's counsel during opening statement. Appellant's counsel's comment verged on argument, which appellant had the opportunity to address and did address in closing argument. Furthermore, the court's admonishment merely reminded counsel and the jury that it is the role of the court to instruct the jury on the law to apply in the case. Accordingly, we overrule this part of appellant's fourth assignment of error.

**VI. Third Assignment of Error—Erroneous Jury Instructions**

{¶ 20} In her third assignment of error, appellant argues the trial court erred in giving a definition of "knowledge" which was not in effect at the time of the offense. Appellant alleges that this amounts to structural error or, at the very least, "there is presumptive and actual prejudice defending a case based on a law, or rather a culpable mental state, that is not in effect at the time of the crime or the trial for that matter." (Appellant's Brief at 43.)

{¶ 21} The state concedes that the definition of knowledge as it existed at the time of the offense should have been given. However, the state argues that although appellant's counsel indicated that they "may want to file an objection to that," counsel never actually did raise an objection. (Tr. Vol. I at 4.) Therefore, the state argues the court should consider the third assignment of error pursuant to a plain error review. The state further argues that no plain error exists because even if the then existing definition of knowledge had been given, "a deliberate ignorance" or "willful blindness" concept is built into the former definition because it required awareness of a probability. (Appellee's Brief at 19.) The state also argues that the outcome would not have been different had the proper instruction been given because appellant's testimony indicates some familiarity with the movie. Finally, the state argues that the error is not structural as it does not affect the framework within which the trial proceeds.

{¶ 22} Crim.R. 30(A) provides, in part, that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Accordingly, where no objection to jury instructions has been lodged, an appellate court undertakes a plain error analysis of the instructions, and all but plain error is deemed waived. *State v. Graggs*, 10th Dist. No. 09AP-339, 2009-Ohio-5975, ¶ 30, citing *State v. Long*, 53 Ohio St.2d 91 (1978). " 'Plain error does not exist unless it can be said that but for the error, the outcome of the proceedings would clearly have been otherwise.' " *State v. Ferguson*, 10th Dist. No. 12AP-1003, 2013-Ohio-4798, ¶ 31, quoting *State v. Todd*, 10th Dist. No. 06AP-1208, 2007-Ohio-4307, ¶ 22.

{¶ 23} The Supreme Court of Ohio has, however, determined that "a party does not waive objections to the trial court's charge by failing to formally object where: (1) the record affirmatively shows the trial court has been fully apprised of the correct law governing a material issue in dispute; and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the charge to the jury." *State v. Butler*, 10th Dist. No. 98AP-55 (Oct. 22, 1998), citing *State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph one of the syllabus.

{¶ 24} We agree with the state that the instruction was not structural error and that it should be considered pursuant to a plain error analysis.[2] Although the transcript reveals that appellant's trial counsel did generally object to the trial court's definition of knowledge, counsel did not object specifically as counsel does now.[3] Furthermore, counsel did not provide the trial court with the correct statement of law. Therefore, we will consider the instruction given for plain error.

{¶ 25} The court gave the following instruction on knowledge:

> When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and *fails to make inquiry or acts with a conscious purpose to avoid learning the fact.* Evidence of mistake, accident, lack of information or other innocent reason can negate the existence of knowledge.

(Emphasis added.) (Jury instructions at 4-5.)

{¶ 26} The parties agree, however, that the following statutory definitions of "knowingly" and "knowledge" were in effect at the time of the offense:

> (B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has

---

[2] In *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, the court considered the nature of a trial court's error in not instructing the jury on the culpable mental state of trespass. Although the error here involved instructing the jury with an incorrect version of a culpable mental state, *Wamsley* is helpful in considering the suggestion of structural error. The *Wamsley* court stated that the trial court's failure to instruct on a culpable mental state is serious error. However, the court noted that it has rejected the concept that structural error exists in every situation in which even serious error occurred. In conclusion, the court held: "As we held in [*State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297], 'both this court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. * * * This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to *encourage* defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed. We believe that our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court -- where, in many cases, such errors can be easily corrected.' " (Emphasis sic.) *Id.* at ¶ 28, quoting *Perry* at ¶ 23. The court remanded the case for the trial court to conduct a proper plain error analysis. It further noted that the failure to instruct on an element is not necessarily reversible as plain error, "[r]ather, an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred." *Id.* at ¶ 17, citing *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph three of the syllabus.

[3] Also, appellant refers to Tr. Vol. II at 306-08 to support allegations that the state and the court specifically understood her objection to the instructions on knowledge. However, these pages contain the state's response to appellant's motion to dismiss for lack of knowledge. Appellant's counsel did not, at this time, specifically object to the court's instruction on knowledge or provide the court with the correct definition. Furthermore, appellant's counsel did not object or correct the court when the court analyzed the motion to dismiss using the instruction on knowledge about which appellant now complains.

knowledge of circumstances when he is aware that such circumstances probably exist.

Former R.C. 2901.22, effective Jan. 1, 1974 to Mar. 23, 2015.

{¶ 27} The OJI instruction in effect at the time of the offense was:

1. KNOWINGLY. A person acts knowingly, regardless of his purpose, when (he is aware that his conduct will probably cause a certain result) (he is aware that his conduct will probably be of a certain nature). A person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B).

2. ALTERNATE. Knowingly means that a person is aware of the existence of the facts and that his acts will probably (cause a certain result) (be of a certain nature).

Former OJI CR Section 417.11, offenses committed before Mar. 23, 2015.

{¶ 28} We agree with appellant and the state that the proper definition of knowledge was the definition as it existed at the time of the offense. However, given the jury's different verdicts on Count 1 and Counts 2-5, it is evident the jury carefully considered the element of knowledge and the evidence. Furthermore, as addressed below in our discussion of sufficiency and manifest weight, the evidence presented supports a finding of knowledge beyond a reasonable doubt pursuant to the definition as it existed at the time of the offense. Without considering whether appellant failed to make inquiry or acted with a conscious purpose to avoid learning the facts, the jury could have reasonably found that appellant had knowledge of the obscene nature of the movie based on: (1) student witness K.E.'s testimony that appellant "knew what it was"; (2) K.E. and, another student witness, R.H's testimony that the volume was on; (3) Chamberlain's testimony that appellant fast-forwarded through the movie when he was in the room; and (4) appellant's own statement to Chamberlain indicating her familiarity with the movie. (Tr. Vol. II 298.) Therefore, we do not find that the trial court's instruction amounted to plain error because we can not find that the outcome of this case would clearly have been otherwise had the correct instruction been given. Accordingly, we overrule appellant's third assignment of error.

## VII. Fourth and Fifth Assignments of Error—Lack of Jury Instructions

{¶ 29} The fourth, in part, and fifth assignments of error allege lack of jury instructions.

{¶ 30} " 'Trial courts have the responsibility to give all jury instructions that are relevant and necessary in order for the jury to properly weigh the evidence and perform its duty as the fact-finder.' " *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 33, quoting *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 51 (10th Dist.). However, when reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *Rawson* at ¶ 19, citing *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 9, citing *Wolons* at 68.

{¶ 31} Furthermore, " '[a]n appellate court will not reverse a conviction in a criminal case due to jury instructions unless it finds that the jury instructions amount to prejudicial error.' " *State v. Dodson*, 10th Dist. No. 10AP-603, 2011-Ohio-1092, ¶ 6, quoting *Aleshire* at ¶ 51. This court uses a three-part test to determine when failing to give a requested instruction constitutes reversible error: (1) the requested instruction must be a correct statement of the law; (2) the requested instruction must not be redundant of other instructions; and (3) failure to give the requested instruction must have impaired the requesting party's theory of the case. *Id.*, citing *Gower v. Conrad*, 146 Ohio App.3d 200, 203 (10th Dist.2001).

{¶ 32} Crim.R. 52(A) defines the doctrine of harmless error in criminal cases and provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless error standard of review, "the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741 (1993).

### A.    Fourth Assignment of Error—Lack of Instruction on "Prurient Interest"

{¶ 33} As noted above, it is not entirely clear what appellant argues in her fourth assignment of error. In addition to complaining that the trial court curtailed her opening statement, appellant appears to also argue the trial court erred by not defining the term "prurient interest" fully and completely as it was defined in *State v. Williams*, 75 Ohio App.3d 102 (10th Dist.1991). Appellant further asserts the trial court erred by instructing the jury that "prurient interest" is not defined in the instructions, although the definition

offered by the state is "what she thinks the word means" and the jury is "in no way bound by that definition." (Tr. Vol. II at 331.)

{¶ 34} In closing argument, the state argued "a prurient interest is something that is not a normal interest in itself." (Tr. Vol. II at 329.) At this point, appellant's counsel objected. At side bar, the court offered to include a technical definition of "prurient interest" in the jury definitions. In response, appellant stated that the jury instructions had already been agreed on and the jury "would have to know on their own knowledge the common use of the words." (Tr. Vol. II at 330.) The state offered to "just say unwholesome interest in sex. That's not a definition." (Tr. Vol. II at 330.) The court agreed and stated it would inform the jury that it is not part of the jury instructions. Appellant offered no further objection. Closing argument resumed and the court instructed the jury as follows:

> You know, it is not defined otherwise in the instructions. When I define a term in the instructions, that is how it must be applied regardless of what you think the word means.
>
> Miss Chappelear's offering to you, because it is not a word that people commonly use day to day, walk around speaking it, she's telling you what she thinks the word means. You are in no way bound by that definition. It's what you understand the word to mean. It is not otherwise defined.

(Tr. Vol. II at 331.) The state then argued, "[a] prurient interest is an unwholesome interest in sex." (Tr. Vol. II at 331.)

{¶ 35} The transcript of the side bar reveals that appellant advocated for no definition of prurient interest and appellant did not further object when the prosecutor suggested that she could just say "unwholesome interest in sex." (Tr. Vol. II at 331.) Taking this into consideration, as discussed previously, the proper standard to apply here would be plain error.

{¶ 36} The prosecutor's definition is not inconsistent with a definition of "prurient interest," which this court in the past found to be correct in *Williams*. In *Williams*, at 118, this court determined that the following instruction regarding the term "prurient" was a "correct, accurate and simple definition of the law as it stands here in the state of Ohio": "Prurient interest is an appeal to an unhealthy, abnormal, unwholesome, degrading, shameful, or morbid interest in sex." *Id.* at 117.

{¶ 37} Furthermore, the trial court instructed the jury that they were "in no way bound by the definition" offered by the state and "it's what you understand the word to mean." (Tr. Vol. II at 331.) A jury is presumed to follow the trial court's instructions. *State v. Norman*, 10th Dist. No. 12AP-505, 2013-Ohio-1908, ¶ 26, citing *State v. Sullivan*, 10th Dist. No. 10AP-997, 2011-Ohio-6384, ¶ 31; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 86. There is nothing in the record indicating that the jury failed to do so here.

{¶ 38} We find the trial court did not commit plain error. Accordingly, we overrule this part of the fourth assignment of error.

### B. Fifth Assignment of Error—Lack of Instruction on Affirmative Defense

{¶ 39} In her fifth assignment of error, appellant argues the trial court erred by not instructing the jury on the affirmative defense of a bona fide educational purpose as outlined in R.C. 2907.31(C)(1). The trial court did not permit the requested instruction because appellant had argued that she was not, in fact, a Spanish teacher.

{¶ 40} The state argues in response that the evidence did not support such an instruction on the affirmative defense. In fact, appellant admitted that she did not have school approval to show the movie and that it was a "boot leg" copy she picked up at a store. Furthermore, the state argues that appellant's theory was that she did not know the contents of the movie and, therefore, it could not have been for an educational purpose. Finally, the state argues that appellant points to no evidence which supports her contention that the movie had a bona fide educational purpose.

{¶ 41} R.C. 2907.31(C)(1) reads:

> It is an affirmative defense to a charge under this section, involving material or a performance that is obscene or harmful to juveniles, that the material or performance was furnished or presented for a bona fide medical, scientific, educational, governmental, judicial, or other proper purpose, by a physician, psychologist, sociologist, scientist, teacher, librarian, clergyman, prosecutor, judge, or other proper person.

{¶ 42} The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is on the accused. R.C. 2901.05(A). Taking into consideration appellant's theory of the case, that she did not know what was in the movie, and the evidence presented at trial, we can

not say that the trial court abused its discretion in finding that appellant did not show by a preponderance of the evidence that the bona fide educational purpose of affirmative defense was appropriate. Therefore, the trial court did not abuse its discretion by not instructing the jury on the affirmative defense of a bona fide educational purpose. Accordingly, we overrule appellant's fifth assignment of error.

## VIII. Second and Sixth Assignments of Error—Sufficiency and Manifest Weight of the Evidence

{¶ 43} In her second and sixth assignments of error, appellant argues the trial court erred by denying her Crim.R. 29 motion for acquittal, and that the guilty verdicts were not supported by sufficient evidence and were against the manifest weight of the evidence.

### A. Standard of Review

{¶ 44} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as recognized* in *State v. Smith*, 80 Ohio St.3d 89, 102 (1997). "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.' " *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 11, quoting *State v. Hernandez*, 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 6.

{¶ 45} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-87. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The

court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 46} Notwithstanding the traditional standards of sufficiency and manifest weight, "[a]n appellate court must conduct an independent review of the record in a First Amendment case 'to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited.' " *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 115 (1989), quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 505 (1984).

{¶ 47} Independent review by an appellate court is limited to those situations where resort thereto is necessary to further the interests protected by the First Amendment. It is wholly inapplicable when those interests have been adequately protected by the judgment under appeal. *State ex rel. Pizza v. Strope*, 54 Ohio St.3d 41, 45 (1990). Inasmuch as the purpose of de novo appellate review of materials found to be obscene is to protect the interests which underlie the First Amendment to the United States Constitution, such review is applicable only where there has been a prior determination that the materials at issue are, in fact, obscene. Conversely, where a fact-finder concludes that the materials in question are not obscene, appellate review of the finding is governed by the principles applicable to appeals of other factual issues.

{¶ 48} Regarding both the sufficiency and manifest weight of the evidence, appellant specifically challenges the elements of (1) obscenity, (2) patently offensive, (3) prurient interest, (4) harmful to juveniles, and (5) knowledge.

{¶ 49} We begin with a de novo review of the element of obscenity, which includes consideration of "prurient interest" and "patently offensive."

**B. Element of Obscene**

{¶ 50} R.C. 2907.01(F) defines "obscene" as follows:

> When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that

group, any material or performance is "obscene" if any of the following apply:

(1)  Its dominant appeal is to prurient interest;

(2)  Its dominant tendency is to arouse lust by displaying or depicting sexual activity,[4] masturbation, sexual excitement,[5] or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

(3)  Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

(4)  Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;

(5)  It contains a series of displays or descriptions of sexual activity masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

{¶ 51} Also relevant, and to be read in pari materia to R.C. 2907.01(F), is the three-part test outlined by the United States Supreme Court in *Miller v. California*, 413 U.S. 15 (1973):[6]

---

[4] "Sexual activity" means "sexual conduct or sexual contact, or both." R.C. 2907.01(C). "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

[5] "Sexual excitement" means "the condition of human male or female genitals when in a state of sexual stimulation or arousal." R.C. 2907.01(G).

[6] In *State v. Burgun*, 56 Ohio St.2d 354, 361 (1978), the Supreme Court of Ohio considered a challenge to the constitutionality of R.C. 2907.01(F) as being overbroad and vague in light of the United States Supreme Court's ruling in *Miller*. In *Burgun,* the Supreme Court held that "[w]e hold that R.C. 2907.01(F) is neither unconstitutionally overbroad nor void for vagueness when it is read *in pari materia* with the *Miller* decision. The *Miller* test for defining obscenity is therefore incorporated into that statute by an 'authoritative' state court construction specifically sanctioned by *Miller*. In addition, a close reading of R.C. 2907.01 in its entirety shows that the statute is not vague but rather extremely precise in defining what conduct is prohibited. Thus, since the current statutory definition has been effectively narrowed to constitutionally permitted parameters, the appellants' proposition of law has no merit." *Id.* at 361.

"* * * As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest * * *; (b) whether the work depicts or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. * * * If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary."

(Emphasis omitted.) *State v. Burgun*, 56 Ohio St.2d 354, 357-58 (1978), quoting *Miller* at 24-25. The requirements of *Miller* are cumulative and mandatory. They provide the analytical screen through which all challenged material must be filtered. *Newlin* at 118.

{¶ 52} In *Newlin*, the Supreme Court set forth a framework for analysis of how R.C. 2907.01(A) and the *Miller* test interact and apply. Pursuant to *Newlin*, we must first examine whether the material depicts or describes, in a patently offensive way, sexual conduct as defined by Ohio law. Second, we examine whether the average person, applying contemporary community standards, would find the material, taken as a whole, to appeal to the prurient interest. Finally, we examine whether a reasonable person would find that the material, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Id.* at 115. We analyze appellant's challenge to the jury's finding that the movie was obscene accordingly.

      1. Step One: Does the movie depict sexual conduct in a patently offensive way?

{¶ 53} The first step, and the one that is easiest to start with because of its objective nature, is to focus on the conduct requirement set forth in the second of the three guidelines in *Miller*, that is, whether the material or work "depicts or describes, in a

patently offensive way, the sexual conduct specifically defined by the applicable state law." *Newlin* at 115, citing *Miller* at 24.

{¶ 54} In *Newlin*, the court noted that the *Miller* court went on to give two "plain examples" of what could be defined by state statute as sexual conduct:

> (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, *actual or simulated.*
>
> (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

(Emphasis added.) *Newlin* at 115-16, quoting *Miller* at 25. The community standards determine if the descriptions or depictions of sexual conduct go so far beyond the customary limits of candor that they are patently offensive.

{¶ 55} Pursuant to Ohio statute, "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). Furthermore, the court in *Newlin* found that "actual penetration need not be shown * * * before [this part of the *Miller* test] is satisfied." *Id.* at 118. In *Newlin*, the court noted that "the industry practice of publishing photographs with a small black dot obscuring the actual contact between sexual organs and various orifices does not preclude a jury from finding representations of ultimate sexual acts * * * to be patently offensive." *Id.*

{¶ 56} In an obscenity case, what appeals to "prurient interest" and what is "patently offensive" are essentially questions of fact. *Miller* at 30. However, the jury or the trial court does not have unbridled discretion to determine these factual questions. They are confined to assessing whether materials depicted or described are " 'patently offensive "hardcore" sexual conduct.' " *Newlin* at 115, quoting *Miller* at 27. No one is to be prosecuted for depicting or describing mere nudity. *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974) (reversing the Supreme Court of Georgia's affirmance of a jury's finding that the movie "Carnal Knowledge" was obscene).

{¶ 57} Appellant argues that the element of "sexual conduct" was not met as that term is defined pursuant to R.C. 2907.01(A). Having viewed the movie, in particular

vignette L, as well as vignette Z, we find that the element of patently offensive sexual conduct was met. The sexual conduct depicted in the movie was hardcore. Therefore, the trial court did not err as to its finding that the movie contained patently offensive sexual conduct. The jury's finding of the same was likewise supported by sufficient evidence and was not against the manifest weight of the evidence.

2. Step Two: Would the (1) average person applying contemporary community standards find the movie, (2) taken as a whole, to appeal to the (3) prurient interest?

{¶ 58} After ascertaining whether the material, work, or performance concerns the sexual conduct defined by state or local ordinances, the trier of fact should then address whether the first prong of the *Miller* test is met, that is, whether " 'the average person, applying contemporary community standards,' would find that the work, taken as a whole, appeals to the prurient interest." *Miller* at 24, quoting *Kois v. Wisconsin*, 408 U.S. 229, 230 (1972); *State v. Jenkins*, 1st Dist. No. C-040111, 2004-Ohio-7131, ¶ 47.

a. ***Average person applying contemporary community standards***

{¶ 59} For purposes of the *Miller* test, the average person is "one with average sex instincts." *Newlin* at 112, citing *Volanski v. United States*, 246 F.2d 842, 844 (6th Cir.1957). In *Jenkins*, the First District observed that its jurisdiction consisted of many different neighborhoods, a diversity of opinion on pornography, and that community standards on decency are not fixed or determined by any one group. The court noted: "We are guided by the principle that 'the term "average person" does not include any number of people, the majority, or a few, or some, but is a term connoting a composite or synthesis of the community.' " *Jenkins* at ¶ 47, quoting *United States v. Treatman*, 524 F.2d 320, 323 (8th Cir.1975), quoting *Newlin* at 112. " 'Qualitatively, the term average person does not mean the "abnormal adult of noxious tendencies or the person of defective or subnormal mentality." ' " *Id.* at ¶ 47, quoting *Newlin* at 112, quoting *State ex rel. Beil v. Mahoning Valley Distrib. Agency, Inc.*, Stark C.P. No. 159612 (Aug. 8, 1960).

{¶ 60} The First District further observed that "[b]y independent review, however, we do not mean to suggest that we are free to impose our own personal standards concerning obscenity * * * there is no 'appellate court test' for obscenity. Rather, when judges are asked to be the trier of fact in an obscenity case, their role, like that of the jury, is to 'gauge the reaction of the community when and as if the "average person" viewed the material.' " *Jenkins* at ¶ 46, citing *Newlin* at 113, citing *United States v. 35mm Color*

*Motion Picture Film*, 491 F.2d 956, 958 (2d Cir.1974). We observe the same of the Tenth District and are guided by the same principle.

{¶ 61} Appellant argues that the trial court used one definition of obscene applicable to adults and another definition of obscene applicable to juveniles. Appellant points to the trial court's comments in denying the Crim.R. 29 motion. In particular, in response to appellant's Crim.R. 29 motion, the court stated:

> [T]his is more than about obscenity. It's about juveniles. I can go down to any drug store in town and pick up 20 copies of Hustler or Play Boy or Penthouse magazine that are perfectly legal to sell. But that doesn't mean it would not be a violation of the law to pass it out to the students.

(Tr. Vol. II at 308-09.) We note, however, that later, regarding the jury instruction on obscenity at the jury instruction conference, the court noted:

> Finally, the defense asked that I add the additional instruction regarding obscene that has more of an average contemporary societal definition separate and apart from juveniles only.
>
> When I reread the statute, it's difficult but I think the way it's set up, it sets up if you do things that are harmful to juveniles, and there's definition of that, it's a misdemeanor. When it goes to the next stage that being obscene which elevates it to a felony, that is not otherwise modified with regard to obscene as to juveniles. I think I have an obligation to construe criminal statutes most strongly against the state and in favor of the defense. So I did add that additional definition in the jury instructions.

(Tr. Vol. II at 315-16.)

{¶ 62} As promised, the trial court did add the additional definition of obscene, from the *Miller* test, in the jury instructions. A jury is presumed to follow the court's instructions. *Norman* at ¶ 26. Therefore, the trial court and the jury applied the proper "average person applying contemporary community" standard when considering whether the movie, taken as a whole, appeals to the prurient interest. In our de novo review, we apply the same.

### b. *Taken as a whole*

{¶ 63} In *Newlin*, the court considered whether certain magazines were considered obscene. The court observed that a "magazine must be looked at as a whole and not as a series of 'works' resulting in a 'volume.' " *Id.* at 117, citing *Penthouse Internatl. Ltd. v. McAuliffe*, 610 F.2d 1353, 1367 (5th Cir.1980). This "taken as a whole" requirement was

first used by the United States Supreme Court in *Roth v. United States*, 354 U.S. 476, 488-89 (1957), as a substitute for the "isolated excerpt approach." Since then, courts have noted that the inclusion of serious literary matter in significant proportions may preclude a finding that a magazine is obscene even though the magazine contains items, photographs for example, which standing alone would be found obscene under the *Miller* test. *McAuliffe* at 1372. However, a quantitative counting of material is not the test. *Newlin* at 117. In *Ginzburg v. United States*, 383 U.S. 463 (1966), the United States Supreme Court affirmed a conviction wherein the trial court had determined that only 4 of 15 articles in a particular magazine were obscene. The United States Supreme Court did not address the specific articles but based its decision on the magazine's "characteristics as a whole, including [its] editorial formats, and not upon particular articles contained, digested, or excerpted in [it]." *Id.* at 466, fn. 5. The movie before us, with 26 different vignettes, is somewhat analogous to a magazine with several different articles or sections. Therefore, we find the *Newlin* approach to the "taken as a whole" criteria to be instructive here.

{¶ 64} Appellant argues that "there was little if any" sexual conduct in the film. If there was, it was passive in nature. More importantly "sexual conduct" clearly was not the dominant theme of the "horror" film. Appellant confuses the criteria outlined in the second prong of the *Miller*/first prong of the *Newlin* test with the criteria outlined in the first and third prongs of the *Miller*/second and third prongs of the *Newlin* test. The "taken as a whole" requirement is part of the first and third prongs of the *Miller*/second and third prongs of the *Newlin* test. *Newlin* at 117. Therefore, we must consider now, not whether sexual conduct was the dominant theme of the movie but, rather, whether, taken as a whole, the movie appeals to the prurient interest.[7]

{¶ 65} In considering whether the movie appeals to the prurient interest, we consider not only vignettes L and Z, which clearly depicted, implied, or simulated hardcore sexual conduct, but also the fact that many scenes depicted, implied, or

---

[7] In *Newlin*, when examining whether the average person applying contemporary community standards would find the material in question, taken as a whole, appeals to the prurient interest, the court noted that the local obscenity ordinance gave five definitions of when a material is obscene. *Id.* at 116-17. The court also noted that the local obscenity ordinance was really identical to R.C. 2907.01 and 2907.31 et seq. *Id.* at 115. Finally, the court noted that the local ordinance "incorporates the first and third tests of *Miller*. It also gives some additional explicit examples of conduct which would constitute the sort of sexual activity that would be in accord with the second example of the second test or prong of *Miller* [: Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals. *Miller* at 25.]." *Newlin* at 117.

simulated sexual activity, masturbation, sexual excitement, nudity, extreme or bizarre violence, cruelty or brutality, sadomasochism, and bodily functions of elimination either by the visual on the screen or the sound accompanying the same, including vignettes B (anal sex), E (masturbation), F (bodily elimination), H (bizarre violence, cruelty, brutality), L (masturbation, penetration without privilege, child rape), O (sadomasochism), Y (bodily elimination, child molestation, bizarre violence, cruelty, brutality), and Z (nudity, vaginal penetration without privilege, ejaculation, sexual contact). We find the average person, applying contemporary community standards, would find that these vignettes meet the definition of obscene outlined at R.C. 2907.01(F)(5):

> It contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

### c. *Prurient interest*

{¶ 66} "Prurient" interest is not the same as a candid, normal, or healthy interest in sex, rather it is a " 'shameful or morbid interest in nudity, sex, or excretion [which] goes substantially beyond customary limits of candor in description or representation of such matters.' " *Newlin* at 116, citing *Roth* at 487, fn. 20 (quoting the definition of the A.L.I. Model Penal Code, Section 207.10(2) [Tent. Draft No. 6, 1957]). Furthermore, as noted previously, this court has accepted a definition of prurient as "an appeal to an unhealthy, abnormal, unwholesome, degrading, shameful, or morbid interest in sex." *Williams* at 117.

{¶ 67} As to the argument that the element of prurient interest was not proven beyond a reasonable doubt and was against the manifest weight, appellant argues (1) that the jury could not find prurient interest because there was no instruction on the prurient interest; and (2) that the intent of the movie was not to arouse or appeal to the prurient interest. As to the first argument, we have already found that the trial court did not err in not providing a definition of prurient interest. As to the second argument, we are mindful that with this step we are instructed to look at the movie from the perspective of the

average person applying contemporary community standards, not from the perspective of the filmmakers. We consider not whether the "intent" of the movie was to arouse or appeal but, rather, simply the "effect" of the movie. The question is whether the movie, taken as a whole, "appeals" to the prurient interest.

{¶ 68} We find the average person applying contemporary community standards would find that the movie, taken as a whole, appeals to the prurient interest. Therefore, the trial court did not err as to its finding that the average person applying contemporary community standards would find the movie, taken as a whole, appeals to the prurient interest. The jury's finding of the same was likewise supported by sufficient evidence and was not against the manifest weight of the evidence.

3. Step Three: Would a (1) reasonable person find that the movie (2) taken as a whole (3) lacks serious literary, artistic, political, or scientific value?

a. *Reasonable person*

{¶ 69} This third prong is not to be determined by a reference to community standards, in this case Franklin County, as is the case in the second prong. Rather, " '[t]he proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole.' " (Footnote omitted.) *Newlin* at 117 , quoting *Pope v. Illinois*, 481 U.S. 497, 500-01 (1987).

b. *Taken as a whole*

{¶ 70} As discussed above, we must consider the movie, taken as a whole, and not as a series of individual vignettes.

c. *Serious literary, artistic, political, or scientific value*

{¶ 71} In *Newlin*, the Supreme Court observed that a magazine may contain explicit sexual conduct subject to prohibition under the second requirement of *Miller*, and a trier of fact may determine that the average person in that community would find that the magazine as a whole appeals to the prurient interest, and that characteristic is the principal appeal of the material. Nevertheless, the magazine would not be legally obscene if, under the objective third prong of *Miller*, the trier of fact also concluded that a reasonable person could find "serious literary, artistic, political, or scientific value." The only exception is when there is a sham attempt to insulate obscene material with non-obscene material. If the intent is to appeal to prurient interest then the mere insertion of

other matter, irrelevant to the predominant theme of the material, will not prevent a determination that the material is obscene.

{¶ 72} Appellant does not argue that this movie has serious literary, political, or scientific value. However, in her reply brief, with one sentence, she argues that "[c]learly there was serious *artistic* value." (Emphasis added.) (Appellant's Reply Brief at 8.) Appellant argues that this was a horror film, and that it appealed to horror and death. The only support appellant offered for this argument is that it was premiered at the Toronto Film Festival. Yet, there is nothing in the record outlining the criteria to premier at the Toronto Film Festival or supporting the notion that the Toronto Film Festival only premiers films with serious artistic value. With this in mind, we can not say this movie had serious artistic value. *Compare McAuliffe* at 1371-73 (holding that the inclusion of "significant content of literary matter including short stories, interviews, and panel discussions of great merit" precluded a finding that the January 1978 issue of Playboy magazine, taken as a whole, lacked serious literary, artistic, political, or scientific value). Therefore, the trial court did not err as to its findings that a reasonable person would find that the movie, taken as a whole, lacks serious literary, artistic, political, or scientific value. The jury's finding on the same was likewise supported by sufficient evidence and was not against the manifest weight of the evidence.

4. Conclusion that the movie was obscene

{¶ 73} Accordingly, applying a de novo standard of review to the element of obscene, we find that the trial court did not err in denying appellant's Crim.R. 29 motion on the element of obscene and the jury's verdict finding the material to be obscene was supported by sufficient evidence and was not against the manifest weight of the evidence.

**C. Element of "Harmful to Juveniles"**

{¶ 74} Appellant challenges as well the sufficiency and manifest weight of the element of "harmful to juveniles." We first note that as to the element of whether the material was harmful to juveniles, we apply the traditional standards of sufficiency and manifest weight of the evidence, as this element is separate and apart from the element of whether the material was obscene. Nevertheless, even applying a de novo standard of review, we would conclude the same as the jury.

{¶ 75} "Harmful to juveniles" means that quality of any material or performance describing or representing nudity, sexual conduct, sexual excitement, or sadomasochistic abuse in any form to which all of the following apply:

(1) The material or performance, when considered as a whole, appeals to the prurient interest of juveniles in sex.

(2) The material or performance is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for juveniles.

(3) The material or performance, when considered as a whole, lacks serious literary, artistic, political, and scientific value for juveniles.

R.C. 2907.01(E).[8]

{¶ 76} Appellant argues that the state did not prove that the movie, when considered as a whole, appeals to the prurient interest of juveniles in sex. As previously discussed, applying a de novo standard, we found the state did prove the element of obscene. Nevertheless, the definition of obscene is different from the definition of harmful to juveniles. Here, the jury was not required to consider whether the average person "applying contemporary community standards" would find the movie, taken as a whole, appeals to the "prurient interest." Rather, the jury was required to consider whether the movie appeals to "the prurient interest *of juveniles in sex*" and is "patently offensive to prevailing standards in the adult community as a whole *with respect to what is suitable for juveniles*." (Emphasis added.) R.C. 2907.01(E)(1) and (2). Considering the same, we find the trial court did not err in denying appellant's Crim.R. 29 motion on the element of harmful to juveniles and the jury's verdict finding the material to be harmful to

---

[8] The United States Court for the Southern District of Ohio considered the constitutionality of R.C. 2907.01(E). Initially, regarding a prior version, the court held: "[T]he Defendants contend that reenacted § 2907.01(E) merely adopts the test from *Miller v. California*, 413 U.S. 15 (1973), as modified for juveniles by *Ginsberg v. New York*, 390 U.S. 629 (1968). Simply stated, no one could reasonably read that statute in that manner. To do so would require that one rewrite subsections (E)(1) and (2), add a new subsection (3) and delete existing subsections (3) through (7). The Ohio Supreme Court has repeatedly stressed that, in construing a statute and, thus, determining legislative intent, the duty of a court is "to give effect to the words used, not to delete words or to insert words not used." *State v. Maxwell*, 95 Ohio St.3d 254, 256 (2002) (internal quotation marks and citation omitted). *Accord, Lesnau v. Andate Enterprises, Inc.*, 93 Ohio St.3d 467, 471 (2001). Since the Ohio Supreme Court would be required to add language to and to delete language from reenacted § 2907.01(E), in order to interpret it in the manner advocated by the Defendants, this Court cannot conclude that reenacted § 2907.01(E) is readily or fairly susceptible to the meaning posited by defendants." *Bookfriends, Inc. v. Taft*, 223 F.Supp.2d 932, 943 (S.D.Ohio 2002). Subsequently, after the General Assembly amended the statute to a near identical version to the current version, the Southern District held that "§ 2907.01(E) defines material 'harmful to juveniles' in conformity with the *Miller-Ginsberg* standard. Therefore, the Court concludes that this statutory provision does not violate the First Amendment." *Am. Booksellers Found. for Free Expression v. Strickland*, 512 F.Supp.2d 1082, 1092 (S.D.Ohio 2007).

juveniles was supported by sufficient evidence and was not against the manifest weight of the evidence.

### D. Element of "Knowledge"

{¶ 77} We again note that as to the element of knowledge, we apply the traditional standards of sufficiency and manifest weight of the evidence, as this element is separate and apart from the element of whether the material was obscene. Nevertheless, even applying a de novo standard of review, we would conclude the same as the jury.

{¶ 78} As to the allegation that the element of knowledge was not proven beyond a reasonable doubt and was against the manifest weight, appellant merely reiterates her argument in the third assignment of error that the trial court used a definition of knowledge that was not in effect at the time of the offense. As noted above, we find no error as alleged in the third assignment of error and overrule the same.

{¶ 79} Furthermore, we consider the evidence relevant to the element of knowledge. In response to questions from Detective Perryman, appellant stated that she had not watched the movie, and in response to Detective Perryman describing some of the movie's scenes, appellant said she "was not aware." (Tr. Vol. II at 182.) Appellant also told Detective Perryman that she had not been able to see the contents of the movie, and that while the movie was playing "she was seated so that she could not see the movie playing[,] [s]he couldn't hear it[,] [a]nd she was too busy taking attendance." (Tr. Vol. II at 183.) One student witness, R.H., testified appellant was reading a newspaper or magazine and that she did not think appellant knew.

{¶ 80} Chamberlain, the assistant principal, however, stated that appellant tried to fast-forward through the movie when he was in the room. Another student witness, K.E., also testified that she thought appellant was watching the movie and that appellant said she brought the movie from home. K.E. also testified that appellant "knew what it was." (Tr. Vol. II at 298.) Both R.H. and K.E. testified the volume was on. The state argues as well that, even if appellant did not know the contents of the movie when she showed it the first time, she would have known after playing the movie to the first class. Finally, appellant's own statement to Chamberlain showed she was familiar with the contents of the movie. (*See* majority opinion at ¶ 14.)

{¶ 81} Considering the same and applying the definition of knowledge in effect at the time of the offense, we find the trial court did not err in denying the Crim.R. 29 motion on the element of knowledge, and the jury's verdict finding appellant had

knowledge of the movie's character or content was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 82} Accordingly, appellant's second and sixth assignments of error are overruled.

## IX. Conclusion

{¶ 83} Appellant's six assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN, J., concurs.
TYACK, J., dissents.

TYACK, J. dissenting.

{¶ 84} Because I reach a different conclusion on a number of issues than the majority, I respectfully dissent. Specifically and most importantly, I would sustain the second and sixth assignments of error because I do not believe that the State of Ohio presented the evidence necessary to sustain convictions.

{¶ 85} Sheila Kearns was a substitute teacher for the Columbus City Schools. She was asked to teach several Spanish courses at East High School in Columbus despite the fact that she does not speak Spanish and the fact that she has no expertise in Spanish. In fact, she was asked to be a "permanent substitute teacher" in the Spanish classes at East High School, meaning that she was expected to teach Spanish for a sustained period of days.

{¶ 86} In order to provide the students with at least a little instruction in Spanish, she went looking for audio-visual aids to show to her classes. She came across a movie entitled "*The ABC's of Death.*" The movie has 26 vignettes, each centering around a letter of the English alphabet and tying that letter to death or dying (not sex or sex acts). The first two vignettes are in Spanish as are some others of the 26. Several vignettes are in other languages, including Japanese, English, and French. It is highly doubtful that Kearns watched the whole movie before she began showing portions of it to her Spanish classes. The testimony at trial demonstrated that she was frequently reading or doing classroom chores while the movie was on the screen.

{¶ 87} After a student in the class viewed a part of the movie, the student complained to another teacher at the high school. The other teacher in turn complained to the assistant principal, Carl Chamberlain, who went to the classroom in which Kearns was

working. Chamberlain was in the room long enough to see a snippet of *The ABC's of Death* including a brief portion in which a woman's breasts were exposed. He immediately ordered that the showing of the movie be stopped.

{¶ 88} Chamberlain took the copy of the movie to another portion of the school and viewed almost the entire movie, something no student at East High School had done. The movie runs far longer than a class period at the high school.  The movie runs almost two hours.  Classes are 47 minutes.  The beginning of each class is routinely absorbed with other activities such as taking attendance.

{¶ 89} As the title implies, the main themes of *The ABC's of Death*, are violence and death. Some of the vignettes include sexual content. Several vignettes do not. For instance, one focuses on a man killing himself. Another, focuses on a man fighting a dog. Again, there are a total of 26 such vignettes.

{¶ 90} Assistant principle Chamberlain indicated that while he was in the room, Kearns was not watching the movie. At least part of the time, she had her back to the screen and was doing other things.  Kearns told Chamberlain that she had not watched the movie before she began showing portions of it to the students.  While Chamberlain was there, Kearns forwarded through parts of the movie.  Obviously no student saw those portions of the movie at that time.

{¶ 91} Ultimately, the showing of parts of the movie generated a great deal of publicity in the media and a five count indictment alleging that Kearns had violated R.C. 2907.31(A)(1) and (A)(2) was issued.  That statute reads:

> (A) No person, with knowledge of its character or content, shall recklessly do any of the following:
>
> (1) Directly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene or harmful to juveniles;
>
> (2) Directly offer or agree to sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene or harmful to juveniles.

{¶ 92} The jury who heard the case found Kearns not guilty of one of the charges, but convicted her of four others. Possibly, the jury felt that Kearns may well have not known what she was showing the students in her first class of the day, but should have know in the four subsequent classes. The jury had access to the whole movie, not just the parts possibly seen by students at East High School, so may have inferred that Kearns showed students the whole movie. There is simply no proof any student saw the whole movie, although the prosecution tried to make Kearns criminally responsible for the whole content of the movie, not just the portions seen by some students.

{¶ 93} The problem with the State of Ohio's case at trial was that the State never demonstrated what students actually saw. As noted earlier, the movie runs far longer than a class period. The chances are minimal that any students saw the last few vignettes which are among the most graphic and objectionable. Certainly, the State did not prove that any students saw these last vignettes, especially the two students who testified at trial. In fact, the State did not prove that any student saw any offensive vignette or group of vignettes. Since several of the vignettes are harmless and are certainly not obscene, the State failed to prove its case. The State simply did not prove that any student saw a vignette which was harmful to juveniles or obscene.

{¶ 94} Only two of the several students in the Spanish classes at East High School testified at the trial of Kearns. R.H. was in the second period Spanish class. R.H. was 18 years old at the time of the trial but had been 16 at the time parts of the movie was shown. R.H. recalled the movie as a "scary movie" not a sexy movie or obscene movie. She recalled a vignette in which a man wrestled with a dog. She also recalled a vignette where a woman inhaled farts and a third vignette (a cartoon) in which a character had a bowel movement and the excrement jumped back into the cartoon character and killed her.

{¶ 95} R.H. recalled seeing the first vignette of the movie in which a couple who wanted adult time with each other scared a young child in order to get the child to stay in bed. The child, afraid that a monster was going to get her, stayed in bed. An intruder entered the residence and killed the couple, but the child who was hiding and quiet survived.

{¶ 96} The adult activity was minimally shown and nowhere near the level which could or would classify the vignette as obscene. R rated movies show a great deal more adult activity. Some PG movies show as much. This vignette was clearly not obscene or harmful to her.

{¶ 97} In short, R.H. recalled seeing no vignette which was harmful or obscene. R.H. recalled Kearns sitting at her desk reading a magazine or newspaper during the showing.

{¶ 98} The second student to testify was K.E.  K.E. was in a sixth period Spanish class.  K.E. had been 17 years old when parts of the movie were shown.  K.E. recalled the movie as having "all kinds of weird stuff," "sexual stuff" and "fighting and violence."  K.E. did not testify about any specific vignette, objectionable or otherwise.  Her testimony did not support a finding that any harmful or obscene material was shown to her.

{¶ 99} Again, because the State did not provide proofs of what parts of *The ABC's of Death* were actually shown to the juveniles and because several portions of the movie are neither harmful to juveniles nor obscene, the State failed to prove its case. A person cannot be convicted of disseminating matter harmful to juveniles if the person does not actually provide the juveniles with material which is harmful or obscene. The fact that other parts of the movie which were not shown to juveniles or not proved to have been shown to juveniles, were more objectionable does not change the actual proof required to prove violations of R.C. 2907.31.  As noted earlier, only two students testified at trial and their testimony does not indicate that they saw any vignette which was harmful or obscene.

{¶ 100}  Again, I would sustain the second and sixth assignments of error.  Since the majority of this panel does not sustain the second and sixth assignments of error, we must address the other assignments of error.

{¶ 101}  There is no doubt that the trial court judge gave an inaccurate definition of "knowledge" to the jury as acknowledged by the majority of this panel.  I doubt that Kearns knew about the objectionable portions of *The ABC's of Death.*  Certainly the evidence did not prove that she knew.

{¶ 102}  Based upon my own viewing of the film, I would find, at most, three vignettes to be objectionable.   I am still relatively sure no student saw two of those vignettes because they are at the end of the film.  The objectionable vignette toward the middle of the film may not have been seen or appreciated by Kearns given the lack of attention she was displaying when Chamberlain was in the classroom and at the times described by the students.  Also the two students who testified did not seem to recall any of the three objectionable vignettes.  The three objectionable vignettes would have been memorable.   Having the jury be charged with the correct law as to knowledge was

important.  The jury did not receive a correct charge and still acquitted Kearns of one of the charges.

{¶ 103}  I therefore would sustain the third assignment of error also.

{¶ 104}  I believe that the trial court judge should also have charged the jury as to the affirmative defense set forth in R.C. 2907.31.  It reads:

> It is an affirmative defense to a charge under this section, involving material or a performance that is obscene or harmful to juveniles, that the material or performance was furnished or presented for a bona fide medical, scientific, educational, governmental, judicial, or other proper purpose, by a physician, psychologist, sociologist, scientist, teacher, librarian, clergyman, prosecutor, judge, or other proper person.

{¶ 105}  Kearns was serving as a substitute teacher in a public school.  Her teaching was for a bona fide educational purpose.  She clearly was a teacher with a teaching purpose within the parameters of R.C. 2907.31(C)(1).  The trial court judge did not allow the jury to even hear about the affirmative defense set forth in the statute.  The judge was not the trier of fact, the jury was.  The jury should have been allowed to decide if the affirmative defense applied.

{¶ 106}  Kearns knew that the early vignettes were in Spanish.  She therefore thought parts of the movie would benefit the students.  The fact that she did not know the full content of the movie does not mean that she did not have an educational purpose in starting to show the movie or showing parts of the movie.  Kearns was a teacher in a public school trying to provide a little Spanish content to Spanish classes.

{¶ 107}  With no knowledge of the Spanish language, she agreed to teach five Spanish classes a day for a sustained period of time.  She went looking for material to fill the time and chose badly.  Again, the jury should have had the opportunity to decide if Kearns had a bona fide educational purpose in showing the film.  The jury was denied that opportunity.

{¶ 108}  I would sustain the fifth assignment of error.

{¶ 109}  As to the fourth assignment of error, the State got away with arguing an inaccurate definition of "prurient interest" to the jury.

{¶ 110}  Ironically, the trial court judge gave a charge to the jury on motive, but refused to give a charge on the affirmative defense in R.C. 2907.31(C)(1).  At the same time, the judge apparently cut off some questioning which should have placed additional

testimony about the affirmative defense before the jury. The core of the affirmative defense is the motive of the teacher. Trial counsel for Kearns should have been allowed to develop the pertinent evidence on motive. The giving of the "motive instruction" was error in light of the refusal to give an instruction as to R.C. 2907.31(C)(1).

{¶ 111} Further, as alleged in this fourth assignment of error, the State got away with arguing in closing arguments an inaccurate definition of "prurient interest" as "not a normal interest in itself." Following a defense objection, the trial court judge did not correct what the assistant prosecutor initially said in closing argument but stated that her definition was a reasonable definition for the jury to use in determining guilt or innocence. Again, that initial definition used by the prosecution was "a prurient interest is not a normal interest in itself." That definition is nowhere near a complete or accurate definition for "prurient interest."

{¶ 112} When she resumed her closing argument, the assistant prosecutor modified her definition of "prurient interest" to "unwholesome interest in sex." That is not an accurate definition and is a significantly different definition from "prurient interest" as "an appeal to an unhealthy, abnormal, unwholesome, degrading, shameful, or morbid interest in sex" as approved in our earlier case of *State v. Williams*, 75 Ohio App.3d 102,      (10th Dist.1991) and in a whole raft of obscenity cases from the United States Supreme Court.

{¶ 113} The majority excuses this error by invoking the doctrine of plain error. I do not see how this appellate court can apply a plain error standard to a prosecutor's misstating of the law and the judge's refusal to correct that misstatement when the misstatement is pointed out. I note in passing that the judge never gave the jury an accurate definition of "prurient interest" from Ohio Jury Instructions or even from our *Williams* case. The jury never heard a correct definition, only the inaccurate definitions provided by the prosecution.

{¶ 114} Also the majority opinion misrepresents the issue in the fourth assignment of error. The trial judge cut off discussion of the law in defense opening statements, but then allowed the prosecution to give a closing argument which was almost completely the assistant prosecutor's view of what the law should be. When defense counsel finally got around to objecting to the prosecution's improper closing argument, the trial court judge did not sustain the objection; instead, the judge told the jury the assistant prosecutor's view of the law was acceptable. The discussion of "prurient

interest" discussed above occurred during closing argument and the definition was not correct.

{¶ 115}  I would sustain the fourth assignment of error also.

{¶ 116}  I personally find fault with the extensive discussion of the movie "taken as a whole" in the majority decision.  No student saw the whole movie.  The majority excludes the credits, which for 26 vignettes are lengthy, and still has to acknowledge a movie length of almost two hours (1 hour, 58 minutes, 14 seconds).  If the students watched the movie for every minute of the 47 minute period, the students saw, at most, 40 percent of the movie.  The two students who testified watched the movie briefly and then started doing homework for other classes.  They did not find the movie particularly memorable.  They certainly were not harmed by what they saw.

{¶ 117}  I am also concerned that the majority decision gives a skewed vision of the contents of *The ABC's of Death.*  My seeing of the movie leaves me with a view which is consistent with the view of the two students who saw a portion of the movie and then testified at trial.  The movie is centered on violence and death, not sex.  The majority opinion finds objectionable 10 vignettes of the 26.  To reach 10, the majority lumps vignettes which it sees as involving violence, brutality and cruelty into the mix to justify its conclusion that the movie taken as a whole is obscene.  I do not see 23 of the 26 vignettes as harmful or obscene.  Some minimal sexual content does not make a vignette or the whole movie either one.

{¶ 118}  In review, the trial of this case was riddled by a lack of evidence and serious mistakes.  I cannot bring myself to affirm the judgment which resulted.  I would sustain all six assignments of error.

_____